KINNEY, Appellant, v. MURRAY et al.

In Banc, December 17, 1902.

1. **Oral Contract to Make a Will:** PROOF OF CONTRACT: PERFORMANCE. A court of equity will specifically enforce a contract to make a will in a particular manner, where a valuable consideration has been received for the promise and a fraud would otherwise be perpetrated upon the promisee or beneficiary. But the proof of such a contract must be so cogent, clear and forcible as to leave no reasonable doubt as to its terms and character; and where the consideration consists of acts to be performed, there must be like proof that the acts performed refer to and result from the contract, and are such as would not have been done save on account of that very contract and with a direct view to its performance.

2. ———: ———: ENFORCING CONTRACT. Where a court of equity is called upon to set aside a will made in conformity to the statutes, and to enforce an oral contract promising to will the estate to a different person, nothing short of evidence that can be relied upon with the utmost confidence, proving the existence of the contract, its terms and conditions and a substantial and meritorious compliance therewith, can justify such a decree.

3. ———: ———: ADOPTION OF CHILD. The evidence in this case is fully reviewed, and it is held that it does not establish an irrevocable contract between two brothers to the effect that one of them agreed to take the small daughter of the other, keep and support her as his child, and give to her all his property at his death.

4. ———: ———: ———: CONSIDERATION: PART PERFORMANCE: STATUTE OF FRAUDS. The fact that one party to the oral contract was childless, and took one of five children of a poor brother, and clothed and kept her in his own home for eleven years, providing her with money and in every way supplying her wants as persons in like circumstances do their own daughters, is equally as consistent with an agreement to aid an impecunious brother to care for his children, as it is with an irrevocable agreement to give her all the estate of which he died possessed. Such facts are therefore not to be considered as such a part performance of an oral contract to make the child his heir as would raise it from under the Statute of Frauds.

5. ———: ———: ———: LOOSE DECLARATIONS OF ORAL AGREEMENT. The testimony of witnesses who forty years ago casually overheard

a desultory conversation between two brothers concerning the terms upon which one was about to take into his own family the child of the other, should be received with great care, if the purpose of such testimony is to set aside a will as being in violation of a contract by one of the brothers with the other that he would, if the child was committed to his care, make her his heir.

6. ————: ————: ERRONEOUS DECREE: NO APPEAL. Where the chancellor has erroneously held that a deceased testator contracted to give his estate to a foster child at his death, but that only a small part of that estate can be decreed to plaintiff because such contract was in conflict with the laws of the State where made and the corpus of the estate is situate, and defendant does not appeal from that decree, the error in behalf of appellant can not be corrected by the Supreme Court.

7. ————: ————: CONTRACT AND PROPERTY IN OTHER STATES. Since it must be held in this case, because of a lack of that positive proof which the law requires, that no contract was made by a deceased testator to give his entire property to his foster child, it is not necessary to determine to what extent such a contract made in Virginia, with a view of residence in Illinois, may control the decree of an equity court in passing upon the right of the child to property that is still in Illinois, the will being made and probated here. But these points are ably discussed in the briefs.

Appeal from Greene Circuit Court.—*Hon. Jas. T. Neville,* Judge.

AFFIRMED.

W. M. Williams with Rathbun & Allen and W. D. Tatlow for appellant.

(1) (a) A court of equity, having obtained jurisdiction over the person in an equitable action, will, if the equities require it, compel such person to convey land situated in another State, by a deed executed according to the laws of such State.. This right, authority and jurisdiction of a court of equity is now, and has been for a century or more, settled by the consensus of judicial opinion in both England and America. The ground of this jurisdiction is that courts of equity have authority to act upon the person: "*aequitas agit in personam.*" And although the court can not bind or af-

fect the title to the land itself by its decree, yet it can bind the conscience of the party in regard to such land, to exactly the same extent as if the land was situated in the territorial jurisdiction of the sovereignty, wherein the court sits. It is the deed of the person, not the decree of the court, that affects the title to the land. Penn v. Lord Baltimore, 1 Ves. Sen. 444; Earl of Kildare v. Eustace, 1 Vern 419; Arglasse v. Muschamp, 1 Vern 75; Lord Cranstown v. Johnson, 3 Ves. Jr. 170; Ex parte Pollard, 4 Deacon 27; Massie v. Watts, 6 Cranch 148; Phelps v. McDonald, 99 U. S. 298; Mead v. Merritt, 2 Paige 402; Mitchell v. Burch, 2 Paige 606; Ward v. Arredonda, 1 Hop. 213; DeKeyn v. Watkins, 2 San. Ch. 185; Khattuck v. Cassidy, 1 Edw. Ch. 152; Sutpen v. Howler, 9 Paige 280; Davis v. Headley, 22 N. J. E. 115; Wood v. Warner, 15 N. J. E. 81; Bullock v. Bullock, 51 N. J. E. 444; McGree v. Sweeney, 84 Cal. 100; Smith v. Davis, 90 Cal. 25; s. c., 27 Pac. 26; Enos v. Hunter, 4 Gillman (Ill.) 211; Cooley v. Scarlett, 38 Ill. 316; Johnson v. Gibson, 116 Ill. 294; Baker v. Rockabrand, 118 Ill. 365; Cloud v. Greasley, 125 Ill. 319; s. c., 17 N. E. 826; Craft v. Railroad, 166 Ill. 580; s. c., 46 N. E. 1132; Pillow v. King, 90 Tenn. 280; s. c., 16 S. W. 469; Pillow v. King, 55 Ark. 639; Poindexter v. Burwell, 82 Va. 513; 2 Story's Eq. Juris. (13 Ed.), pp. 632 to 636; 1 Perry on Trusts (2 Ed.), secs. 71 and 72; Eaton v. McCall, 86 Me. 346; s. c., 29 Atl. 1103; Reed v. Reed, 75 Me. 264; Frank v. Peyton, 82 Ky. 151; Olney v. Eaton, 66 Mo. 563; Newton v. Bronson, 13 N. Y. 587; Gardner v. Ogden, 22 N. Y. 332; 3 Pomeroy's Eq Juris. (2 Ed.), sec. 1318. Such decree can only be enforced by the process of the court that rendered it. By the execution of the conveyance as directed, such conveyance is effective in the *situs rei*, but not the decree. The court rendering the decree can not appoint a commissioner to execute a conveyance for such party, in case of his refusal to do so, and the deed of such a commissioner would not convey the title to such land. Bullock v. Bullock, 51 N. J. E. 444; s. c., 27 Atl. 435; Lindsley v. O'Reilly, 50 N. J. L. 641;

s. c., 15 Atl. 379; Watts v. Waddle, 6 Pet. 389; Watkins
v. Holman, 16 Pet. 25; Freyer v. Meyers, 13 S. W.
1025; Morris v. Hand, 70 Tex. 483; s. c., 8 S. W. 210;
Jones v. Jones, 30 N. Y. S. 177; Ross v. Railroad, 53
Ga. 514. (b) The power, and right of a court of equity,
having jurisdiction over the person, to regulate and con-
trol his conscience, and compel him to convey foreign
real estate, is illustrated by another line of authorities,
which really involves the identical principle—that is, a
court of equity will enjoin parties from prosecuting an
action in another State. In such cases the court does
not claim the power to control the foreign court, but
only the parties before it. All that is required is for
the party to show a clear equity. Wonderly v. Lafay-
ette Co., 150 Mo. 653; Sandage v. Studebaker, 142 Ind.
157; Taeger v. Landsley, 69 Iowa 725; Dehorn v. Fos-
ter, 4 Allen 545; Claflin v. Hamlin, 62 How. Pr. 284;
Kettle v. Kettle, 8 Daly 74; Snook v. Snetzer, 25 Ohio
St. 520; Cole v. Cunningham, 133 U. S. 107; Phelps v.
McDonald, 99 U. S. 298; Miller v. Gittings, 37 Atl. 372;
16 Am. and Eng. Ency. of Law (N. S.), pp. 420-1 and 2;
Densmore v. Neresheimer, 32 Hun (N. Y.) 204. In the
last case, the court enjoined the prosecution of an action
in the court of another State, brought to avoid a decision
of the New York court, differing from the rule upon the
same subject in that State. (2) Oral contracts exactly
like the one pleaded and proven in this case have been
repeatedly specifically enforced in equity by the courts
of this and other States on the ground there was such
part performance as to take them out of the statute of
frauds. Sharky v. McDermott, 91 Mo. 647; Healy v.
Simpson, 113 Mo. 340; Nowack v. Berger, 133 Mo. 24;
Sutton v. Hayden, 62 Mo. 101; Davis v. Hendricks, 99
Mo. 478; Wright v. Tinsley, 30 Mo. 390; Gupton v.
Gupton, 47 Mo. 37; Fuchs v. Fuchs, 48 Mo. 23; Teats
v. Flanders, 118 Mo. 669; Hall v. Harris, 145 Mo. 621;
Hiatt v. Williams, 72 Mo. 214; Alexander v. Alexander,
150 Mo. 579; Carmichael v. Carmichael, 72 Mich. 76;
16 Am. St. Rep. 528; Wright v. Wright (Mich.), 58 N.
W. 54; Svenburg v. Fossen (Minn.), 78 N. W. 4; Van-

dyke v. Veerland, 11 N. J. E. 370; s. c., 12 N. J. E. 142; Davidson v. Davidson, 13 N. J. E. 246; Vantyne v. Vantyne (N. J.), 15 Atl. 249; Owens v. McNally, 113 Cal. 444; 45 Pac. 710; Kolfka v. Rosicky (Neb.), 59 N. W. 789; Britton v. Van Cotton, 33 Pac. 218; Weeks v. Lund, (N. H.), 45 Atl. 249; Quinn v. Quinn (S. D.), 58 N. W. 808; Burns v. Smith, 21 Mont. 251, 53 Pac. 742; Gates v. Gates, 54 N. Y. S. 454; Johnson v. Martin, 48 N. Y. S. 102; Godine v. Kidd, 19 N. Y. S. 335; Warren v. Warren, 105 Ill. 568; Brown v. Southerland, 129 U. S. 238; Rhodes v. Rhodes, 3 Sand. 279; Jaffee v. Jacobson, 48 Fed 21; Haines v. Haines, 6 Md. 535; Oakford v. Hackney, 92 F. 39; Slingerham v. Slingerham (Minn.), 39 N. W. 146; 3 Pom. Eq. Juris. (2 Ed.), sec. 1402. (3) (a) It is of course elementary that matters respecting the remedy, such as the bringing of suits, admissibility of evidence, statutes of limitations, etc., are governed by the law of the place where the suit is brought. Wharton on Con. Law, sec. 764; Dicey on Con. Law, pp. 711 and 714; Westlake on P. I. L., secs. 348, 362, 363 and 364; Pritchard v. Norton, 106 U. S. 127; Ruche v. Buck, 124 Mo. 178; Williams v. Railroad, 123 Mo. 573; Richmond, etc., v. Mitchell, 18 S. E. 290; Johnson v. Railroad, 59 N. W. 66; Helton v. Railroad, 12 So. 277; Musser v. McRea (Minn.), 38 N. W. 103. (b) The Illinois and Virginia statute of frauds, offered in evidence by the defendants, only relate to the remedy or the nature and quality of evidence required to establish such a contract (as the one relied upon by the plaintiff) in those States; and hence, only apply in the States where enacted, and do not have any extraterritorial force or effect. Such is the great weight of authority. Leroux v. Brown, 12 C. B. 801; Bain v. Whitehaven, 3 House of Lords 17; Heaton v. Eldridge (Ohio), 46 N. E. 638; Buhl v. Stephens, 84 F. 922; O'Bear v. Bank (Ga.), 33 L. R. A. 384; Downer v. Cheesebrough, 39 Conn. 39; s. c., 4 Am. Rep. 29; Townsend v. Hargraves, 118 Mass. 325; Hoodley v. N. T. Co., 115 Mass. 304; Williams v. Haynes, 27 Iowa 251; Bird v. Monroe, 66 Me. 340; Des Moines v. L. Ins. Co., 50

Pac. 210; Hunt v. Jones, 12 R. I. 635; 34 Am. Rep. 634; Galloway v. Combs, 1 Dug. 348; Kingley v. Cousins, 47 Me. 91; Wright v. Jones, 105 Ind. 28; Jones v. Loyd, 117 Ill. 597; 7 N. E. 119; Emery v. Burbank (Mass.), 39 N. E. 1026; Nowack v. Berger, 133 Mo. 38; Cash v. Clark, 61 Mo. App. 636; Moore v. Mount Castle, 61 Mo. 424. Even where the statute declares in so many words that the contract is void, it does not make it so, as it has universally been held that it is only voidable. Cohn v. Broadhead, 71 N. W. 746. (4) (a) Admitting that the Illinois statute of frauds governs in this case, the case is in no different position than if the Missouri statute was the governing statute. If the respondents had simply offered in evidence the Illinois statute of frauds (it being identical with the Missouri statute) the facts pleaded and proven by the plaintiff would take the case out of that statute as readily as out of the Missouri statute; so it is the Illinois decisions, not the statute, upon which respondents rely. If you place the Illinois decisions, offered in evidence by respondent, in juxtaposition with the decisions of this court, you will find that both courts hold: *First.* That such contracts are valid and binding, and will be specifically enforced against the parties, their heirs, legatees and devisees. *Second.* That such contracts are within the statute, if not in writing. *Third.* The equitable rule is that an oral contract affecting an interest in lands may be enforced, notwithstanding the statute of frauds, if it is so far performed, that to permit the other party to repudiate the contract, would itself be a fraud. Wallace v. Rappleye, 103 Ill. 229; Pond v. Sheean, 132 Ill. 312; Dicken v. McKinley, 45 N. E. 134 (Above cases were offered in evidence by them); Martin v. Martin (Ill.), 48 N. E. 924; Winton v. Winton, 53 N. E. 722; Gains v. Kendall, 176 Ill. 228; Keith v. Miller, 51 N. E. 151. (b) The doctrine of "part performance," with reference to the statute of frauds, is an equitable one, originally recognized only by courts of equity. The question is not, has there been part performance; but does the part performance, with its attending circum-

stances, make such a case that, unless the equitable doctrine of estoppel be applied, and the defendant estopped from relying on the statute, he will be permitted to perpetrate a fraud on the plaintiff? It rests on estoppel and fraud, two of the most ancient grounds of jurisdiction in equity. Green v. Jones, 76 Me. 563; Woodbury v. Gardner, 77 Me. 68; Townsend v. Banderwerker, 160 U. S. 171; Brown v. Hogg, 29 N. W. 135; Stelling v. Stelling, 42 Atl. 271; Kolfka v. Rosesickey, 59 N. W. 788; Svenburg v. Fossam, 78 N. W. 4; 3 Pom. Eq. Jur., 1409; Story on Eq., sec. 759-760-1522; 8 Am. and Eng. Ency. of Law, 748-9. (c) Part performance of a verbal contract, with reference to land, will not take the case out of the statute at law, so that the party can maintain an action at law for damages or other like action. Jackson v. Pierce, 2 Johnson 221; Morton v. Preston, 15 Me. 14; Henry v. Wells (Ark.), 3 S. W. 637; Brockway v. Thomas, 36 Ark. 518; Gooth v. Jackson, 6 Ves. Jr. 39; Kelly v. Webster, 12 C. B. 283; Kidder v. Hunt, 1 Pick. 328; Brown on St. of F. (4 Ed.), 451; 8 Am. and Eng. Ency. of Law, 739. (5) (a) While the rule is that the construction given to the statute, or Constitution of a State by its supreme judicial tribunal, will be followed by the Federal courts and those of other States; this is not so when the decisions of such other State is upon a general question of equity or common law, and is not upon any local statute or usage; in such cases the court in which the cause is being tried will determine the law for itself, and will not be bound by the courts of such other State, giving a different construction to the general or common law. Franklin v. Twogood, 25 Iowa 529; Bank v. Greene, 33 Iowa 141; Franklin v. Hart, 82 N. Y. 413; Bank v. Bank, 128 N. Y. 26; s. c., 27 N. E. 849; Alexander v. Bank, 47 S. W. 840; Railroad v. Thompson, 33 S. W. 718; 6 Am. and Eng. Ency. of Law (N. S.), 283. (b) Although there is a Federal statute providing that the Federal courts in common-law actions shall follow the decisions of the courts of the State in which the Federal court is sitting, it has universally been held by the Federal courts that

the decisions of the State court must be a construction of a local statute or Constitution, or establishing a local custom, or rule of property and that the Federal courts are not bound by the decisions of the State court as to the general or common law.   Carpenter v. Ins. Co., 16 Pet. 495; Huff v. Railroad, 100 U. S. 226; Oates v. Bank, 100 U. S. 246; Railroad v. Bank, 102 U. S. 28; Swift v. Tyson, 16 Pet. 1; Meritt v. Railroad, 107 U. S. 109; Liverpool Steam Co. v. Ins. Co., 129 U. S. 443; Smith v. Alabama, 124 U. S. 478; Western U. T. Co. v. Cook, 61 Fed. 624; Railroad v. Baugh, 149 U. S. 368; Gardner v. Railroad, 150 U. S. 349; Railroad v. Prentice, 147 U. S. 101; Neves v. Scott, 13 How. (U. S.), 258; Russell v. Southard, 12 How. (U. S.), 139.   (The last two cases involve real estate.)   (c)   Although the basis of the action may be a local statute, yet if the case does not turn upon the wording of the statute, and the real question passed upon is one of general jurisprudence, the same rule applies; to illustrate, the Federal court is bound by the decision of a State court that bonds issued under a local statute are void, but not its conclusion that they are void in the hands of a bona fide holder for value.   Pana v. Bowler, 107 U. S. 540; Ryan v. Staples, 76 Fed. 721; Beard v. Ins. Dist. etc., 88 F. 375; Speer v. Board of Co. Com., 88 Fed. 749; Bergers v. Seligman, 107 U. S. 31; Clark v. Beaver, 139 U. S. 96; Murray v. Railroad, 92 Fed. 868.   (d)   Even where the State court construes a local statute, or its decisions create a rule of property, and, hence, such decision would ordinarily be binding on the Federal court, yet the Federal or any other court will not be bound thereby if rendered after the parties' rights have accrued.   Bergers v. Seligman, 107 U. S. 32; L. R. Co. v. City, 76 Fed. 296; Clark v. Beaver, 139 U. S. 96; Speer v. Board of Coms., 88 Fed. 749; Bartholomew v. City of Austin, 85 Fed. 359; Ryan v. Stephens, 76 Fed. 721; Christian Union v. Young, 101 U. S. 352.   (The last two are cases in which real estate is involved.)   (6)   This being a personal or transitory action—not one involving title to Illinois real estate—the contract is to be considered

solely from the standpoint of a personal obligation and governed by the rule of *lex loci contractus,* with the exception that if the Illinois laws and decisions, offered by respondents, show the law of that State to be such as not to permit or enable the defendants to do what the court might otherwise think right to decree, then such laws and decisions are a defense. Inasmuch as such is not claimed for them, and as they do not affect the case, under the proper application of the doctrine of *lex loci contractus,* this court, in the exercise of its conceded jurisdiction over the respondents, and in administering the equities between the parties, "will act upon their own rules, and are not influenced by any consideration of what the effect of such contract might be in the country [Illinois] where the lands are situated, or of the manner in which the courts of such countries might deal with such equities." Ex parte Pollard, 4 Deacon. 27; Westlake's Private International Law (3 Ed.), 172; Dicey on Con. of Law, p. 218; 1 Lewin, Law of Trust, p. 84, sec. 4; Keldare v. Eustace, 1 Ver. 419; Story on Con. of Law, secs. 544-5; Lord Cranstown v. Johnson, 3 Ves. Jr. 170; Neves v. Scott, 13 How. (U. S.), 268; Russell v. Southard, 12 How. (U. S.), 139; Thomas v. Hatch, 3 Sumn. 170; s. c., 23 Fed. Cases 946; Ryan v. Stephens, 76 Fed. 721; McQuerry v. Gilleland, 89 Ky. 234; 1 Beach on Trusts, p. 35, sec. 28; Mercantile, etc. Co. v. The River, etc., 61 Law J. (Ch. Div.) 473; Ex parte Holthausen, 44 L. J. (N. S.) Eq. 26; 1 Perry on Trusts, sec. 71, p. 51; Cood v. Cood, 9 Jur. (N. S.) 1335. (7) No principle of the law is more elementary than that the law of domicile and residence of the deceased controls the disposition of personal property. The trial court so held, and counsel for respondents admitted its correctness. This being so, on the undisputed and admitted facts, the appellant is entitled to a decree as prayed, except as to 320 acres of the Illinois land; even, admitting all respondents claim with reference to the rule of *lex loci rei sitae* for the following reasons: (a). The contract is testamentary in its character, and was to take effect at their death, and to be performed at the

place of their last domicile.   (b).   The undisputed evidence shows that John S. Benson brought $40,000 in personal property to Missouri with him, and that he purchased all of the Illinois land, except 320 acres, after he moved to, and became a resident of this State.   (c) The money with which the Illinois land was purchased, was subject to and reached by this contract, and, hence, Benson could not so invest it as to retain the use and benefit of it during their lives, and so it could be devised by them in violation of the contract.   The authorities all agree on this.   Wenton v. Wenton, 179 Ill. 32; s. c., 53 N. E. 722; Henderson v. Blackburn, 104 Ill. 227; Lenhard v. Specht, 180 Ill. 208; s. c., 54 N. E. 315; Fogle v. Protestant, etc., Church (S. C.), 26 S. E. 99.   (d) "It is a well-settled principle of law that when a trustee purchases property with the trust funds, and takes the title in his own name, a trust results for the benefit of the trustee."   Patterson v. Booth, 103 Mo. 413; Phillips v. Averfield, 100 Mo. 466; Harvey v. Donohoe, 97 Mo. 141; Mabary v. Dollarhide, 98 Mo. 198; Green-Tree, etc., Co. v. Dodd, 45 Mo. 603; Dailey v. Dailey, 125 Mo. 96; Snorgrass v. Moore, 30 Mo. App. 232; Pundman v. Schoenich, 144 Mo. 149; Evangelical Synod, etc. v. Schoeneich, 143 Mo. 653.   (e)   The money, with which the Illinois land was purchased being reached by the contract, and impressed with a trust in favor of plaintiff—that it should be hers after their death—the land is impressed with the same trust.   Munro v. Collins, 95 Mo. 33; Henderson v. Blackburn, 104 Ill. 227; Lenhard v. Specht, 108 Ill. 280; s. c., 54 N. E. 315.   (f) Whatever extravagant claims may be made for the Illinois decisions, offered in evidence by respondents, they do not show that the doctrine of a resulting trust from the payment of the purchase money is not recognized in that State.   This being the law of this State, it is presumed to be so there; as it in fact is.   Williams v. Brown, 14 Ill. 200; Smith v. Smith, 85 Ill. 189; Wallace v. Carpenter, 85 Ill. 590; Stephenson v. McClintock (Ill.), 31 N. E. 310.   (8)   If plaintiff has made a case that entitles her to specific performance of the contract,

the court will not refuse relief because it may be impossible or impracticable to specifically enforce it. In such cases it is well settled that the court can render a decree for damages in lieu of performance. Hamilton v. Hamilton, 59 Mo. 234; Hallard v. Anderson, 38 Mo. 55; Lydick v. Holland, 83 Mo. 76; Need v. Hutchinson, 111 Mo. 620; Townsend v. Vanderwerton, 160 U. S. 171; Sullivan v. O'Neal, 66 Texas 333; Hatch v. Cobb, 4 Johns. Ch. 559; Aday v. Echols, 18 Ala. 853; Hadough v. Scott, 41 N. Y. 45; Church, etc. v. Railroad, 46 N. J. E. 372; Day v. Hunt, 112 N. Y. 191; Miles v. Dover, etc., Co., 125 N. Y. 294; Wonson v. Fend, 129 Mass. 405; 22 Am. and Eng. Ency. of Law, 1005.

*R. L. Goode, T. J. Delaney* and *J. T. White* for respondents.

(1) "The specific performance of a contract is in equity a matter not of absolute right to the party asking it, but of sound discretion in the court. . . . It requires much less strength of case on the part of a defendant to resist a bill to perform a contract than it does on the part of a plaintiff to maintain a bill to enforce a specific performance." Veth v. Geirth, 92 Mo. 97; Paris v. Hailey, 61 Mo. 453; Young v. Daniel, 63 Am. Dec. 477; Story's Eq. Jur., secs. 769-770; Woods v. Evans, 113 Ill. 190. (2) The proof of the supposed agreement is incomplete and unsatisfactory. "The burden is on the plaintiff to establish the contract of which he claims the benefit by evidence that is cogent, clear and convincing." Teats v. Flanders, 118 Mo. 660; Johnson v. Quarles, 46 Mo. 423; Anderson v. Scott, 94 Mo. 637; Berry v. Hartzell, 91 Mo. 132; Clark v. Clark, 13 N. E. (Ill.) 553; Neal's Exrs. v. Gilmore, 79 Pa. St. 421; Taylor v. Shroeder, 107 Mo. 206; Brownlee v. Fenwick, 103 Mo. 420. "Hence, specific performance will not, of course, be decreed of a contract when any material parts of the terms or conditions are uncertain." Nichols v. Williams, 22 N. J. Eq. 63; Poorman v. Kilgore, 26 Pa. St. 365; Shakespeare v. Markham, 10 Hun 311; Bowen v. Bowen, 2 Bradf. 336; Wright

v. Wright, 31 Mich. 380; Story Eq. Jur., sec. 764. "And specific performance will not be decreed unless the evidence shows substantially the same contract set out in the bill." Davis v. Hendricks, 99 Mo. 478; Brown v. Brown, 47 Mich. 378; Sitton v. Shipp, 65 Mo. 297. In this case there is not a scintilla of evidence tending to prove the contract set out in the bill, which was to adopt plaintiff. Such a thing as adoption was then unknown to the law. There was no statute of adoption in either Virginia or Illinois. Adoption did not exist at common law. Anderson's Law Dictionary, "Adopt," p. 36. (3) The alleged contract was utterly void as to Mrs. Amanda Benson and could not affect any property of hers not left her by her husband at his death, because she was under disabilities of coverture when it was made. This is, we believe, conceded now by appellant. R. S. Illinois, 1845-1856; Statutes of Virginia, 1849; Sprinkle v. Hayworth, 26 Gratt. 324. And as she was married when it was made she could not ratify it. Musick v. Dodson, 76 Mo. 624. The record in this case admits that no enabling acts had been passed in either Virginia or Illinois to empower married women to make contracts prior to the adoption of the one in question. She was not, therefore, bound, nor is her estate bound, unless she made another agreement after becoming discovert. Teats v. Flanders, 118 Mo. 660. (4) Whatever personalty Mrs. Amanda Benson accumulated after the death of John S. Benson by frugality and good management, whether said accumulations were out of the emblements or rent of the Illinois land or from other sources, was her own estate, free from any claim in plaintiff's favor by virtue of the alleged contract, which Mrs. Benson beyond a doubt had a perfect right to bequeath to whom she pleased. This is true if she took only a life estate in the lands subject to a trust in favor of the plaintiff. "Another of the important rights which a tenant for life has, as also other tenants of estates of uncertain duration, is that of emblements or profits of the crops which the law gives him." 1 Washburn on Real Property (4 Ed.), 132; Williams on Exrs.,

597. So it is manifest that Mrs. Benson owned the personal property bequeathed by her in her own right and as she was a married woman when the alleged contract was made this personalty was not bound by it. (5) The final settlement of the estate of John S. Benson, in which the probate court of Greene county, Missouri, found that there was $2,483.60 net balance left in the hands of the administratrix, which was ordered to be paid over to Amanda Benson, is conclusive that this was the amount received by her from said estate and can not be collaterally attacked. "The orders and judgments of the probate courts of this State as well as of the county courts, when they exercise probate jurisdiction, are entitled to the same favorable presumptions and intendments as are accorded to orders and judgments of circuit courts." Price v. Springfield Real Estate Ass'n, 101 Mo. 107; Rowden v. Brown, 91 Mo. 429. Besides, there is no evidence to show that the sums which plaintiff contends were sent from Illinois after Benson's death are not included in the administration of his estate. Moreover, said sums were nothing but emblements or rents to which she was entitled, and if the judgment of the probate court be not conclusive, still Amanda Mitchell was entitled to one-half of all personalty in this estate, as the record shows John Benson died childless. R. S. 1879, sec. 2190. (6) The town of Lacon, in the State of Illinois, was the domicile of John S. and Amanda Benson, who were to perform the alleged contract; it was to immediately become the domicile of the child, Mattie, to whom performance was to be rendered and who was to receive the benefits thereof and was contemplated by the parties to the agreement, when made, as the place of performance. These facts make it clear beyond question that the contract was an Illinois one and governed by the laws of that State. Dicey on Conflict of Laws, pp. 570-571; Story on Conflict of Laws, 280; Kentucky v. Bassford, 6 Hill (N. Y.), 526; Cox v. U. S., 6 Peters 172; Chatenay v. Tel. Co., 1 G. B. (C. A.), 79; Wayman v. Southard, 10 Wheat. 1; Pritchard v. Norton, 106 U. S. 124; Haughtling v. Ball,

Kinney v. Murray.

19 Mo. 84; s. c., 20 Mo. 563; Loyd v. Guibert, 7 P. D.
(C. A.), 589; Scudder v. Bank, 91 U. S. 406; In re Missouri Steamship Co., 42 Ch. D. (C. A.), 321; The August, p. 328; St. L. Type Foundry Co. v. Jackson, 128
Mo. 128; Hamlin v. Talisker Distillery, A. C. 202; Roach
v. St. Louis Type Foundry, 21 Mo. App. 118; Hartman v. Railroad, 39 Mo. App. 94; Said v. Stromberg,
55 Mo. App. 438; Stix v. Mathews, 63 Mo. 371; 75 Mo.
97; Long v. Long, 141 Mo. 374; Sturdevant v. Bank, 60
Fed. 730; Bank v. Woods, 8 N. E. 753; Kling v. Fries,
33 Mich. 277; Turnow v. Hochstedder, 7 Humph. 80;
Young v. Pearson, 1 Cal. 448. "Where contracts are
made in one place and to be performed in another, they
are to be governed by the law of the place of performance as to validity, nature, obligation and interpretation." 3 Am. and Eng. Ency. of Law (1 Ed.), p. 561.
(7) Whether the contract is an Illinois one or not, the
law of Illinois governs its validity and enforcement as to
the lands in that State. This rule as to all immovable
property is universally recognized. "That all real
property and contracts and instruments affecting the
title thereto and immovable property are exclusively
subject to the law of the government within whose territory the land is situate, is the generally accepted doctrine both in America and England." 3 Am. and Eng.
Ency. of Law (1 Ed.), 563; Bank v. Bank, 155 Mo. 103;
Richardson v. De Giverville, 107 Mo. 422; 2 Parsons on
Contracts (7 Ed.) 701; Story on Conflict of Laws, sec.
424-463; Jones on Real Property, sec. 189; 3 Am. and
Eng. Ency. of Law (1 Ed.), 565, note 4; Dicey on Conflict of Laws, pp. 365, 516 to 529, and 769 to 773; Westlake on Private International Law (3 Ed.), 189; Wharton on Conflict of Laws, sec. 372; Wolf v. Burk, 19 L.
R. A. 792; Cochran v. Ward, 31 N. E 581; Holbrook v.
Ives, 44 Ohio St. 524; Bank v. Hughes, 10 Mo. App. 13;
Bissell v. Terry, 69 Ill. 184; Davenport v. Karnes, 70
Ill. 467; Gardner v. Bank, 95 Ill. 298; Williams v. Kimball, 16 So. 783; Heyer v. Alexander, 108 Ill. 385; Moore
v. Church, 70 Iowa 208; Doyle v. McGuire, 38 Iowa 410;
Kelly v. Davis, 28 La. Ann. 773; Pickeral v. Robertson,

109 U. S. 608; Succession of Larendon, 39 La. Ann. 952; Ross v. Ross, 129 Mass 243; Danner v. Brewer, 69 Ala. 191; Jacobs v. Credit Lyonnais, 12 Q. B. D. (C. A.) 589; Wills v. Cowper, 2 Ohio, 124; Hosford v. Nichols, 1 Paige Ch. 220; Le Breton v. Miles, 8 Paige Ch. 261; Goddard v. Sawyer, 9 Allen (Mass.) 78; Houston v. Howland, 7 Gill & J. (Md.) 480; Ordronaux v. Rey, 2 Sandf. Ch. (N. Y.) 33; Warrender v. Warrender, 9 Bligh 127; Dundas v. Dundas, 2 Dow & C. 349; Coppin v. Coppin, 2 P. Wms. 291; United States v. Crosby, 7 Cranch 115; Kerr v. Moon, 9 Wheat. 565; McCormack v. Sullivan, 10 Wheat. 192; Anderson v. May, 10 Heisk. 84; Hawley v. James, 32 Am. Dec. 623; Sneed v. Ewing, 5 J. J. Marshall 460, 22 Am. Dec. 56. (8) This rule applies when the construction of the statute of frauds of another State, as affecting a real estate contract, is involved, whether such statute declares a given contract void or merely declares that no action shall be brought upon it. The *lex loci rei sitae*, and not the *lex fori* controls. Story on Conflict of Laws, sec. 262; Cochran v. Ward, 29 N. E. 795; Wolf v. Burke, 19 L. R. A. 792; Cobb v. Griffith, 12 Mo. App. 130; Seigel v. Robinson, 93 Am. Dec. 775; Burrell v. Root, 40 N. Y. 496; Miller v. Wilson, 34 N. E. (146 Ill. 523) 1111; Throop v. Smith, 17 N. E. (N. Y.) 675; Cleveland v. Lawing, 31 Atl. 20; De Costa v. Davis, 4 Zab. (N. J.) 319; Houghtaling v. Ball, 20 Mo. 564.

BRACE, J.—This is a suit in equity, instituted in the Greene Circuit Court on the 15th of March, 1899, to specifically enforce an oral contract, alleged to have been entered into in the year 1855 or 1856 in the State of Virginia, between the plaintiff's parents, Edward S. Benson and his wife, and her uncle John S. Benson (brother of the said Edward) and his wife Amanda, whereby it is alleged that the said John S. Benson and Amanda Benson, his wife, agreed "that they would take the plaintiff herein as their adopted child, educate and care for her as a natural child until she was fully grown, and if the said John S. Benson and Amanda

Benson should have no natural child or children born of their said marriage, then at the death of the said John S. Benson and Amanda Benson, this plaintiff should receive all of their property, real, personal and mixed, wherever situated.''

In the year of 1885 the said John S. Benson died testate and childless, having by his last will and testament, executed October 20, 1880, and duly admitted to probate in the probate court of Greene county, Missouri, on October 2, 1885, devised and bequeathed all of his property, real, personal and mixed, to his wife, the said Amanda F. Benson, who was appointed executrix of his will, and upon final settlement of his estate in said court, the sum of $2,483.60 was distributed to her as the sole legatee under said will. As sole devisee under said will she also came into the possession of 960 acres of valuable land in the State of Illinois. Afterwards she intermarried with one Walter Mitchell, who died leaving her a widow, and afterwards on February 12, 1899, she died testate and childless, having by her last will and testament duly admitted to probate in the probate court aforesaid on the 18th day of February, 1899, devised and bequeathed all her estate to the defendants. It is alleged in the petition that the property so devised and bequeathed by the said Amanda ''is of the value of about $100,000, and is the property that the said Amanda Benson received under the will of her deceased husband John S. Benson, the real estate in Illinois being identically the same property, and the personal property being the accumulation from the rents and profits of the said real estate in Illinois, and the proceeds of the sale of other property received by her under said last will of said John S. Benson, and the increase therefrom.''

At the close of the evidence the court made a finding of facts at the request of the plaintiff, which is as follows:

''In 1856 John S. Benson and his wife Amanda lived in the State of Illinois; Edward Benson and his

wife and several children lived on the eastern shore of Virginia. Edward and John S. Benson were brothers. John S. and Amanda Benson were in moderate circumstances, having some two or three thousand dollars worth of property, but no children. Edward and his wife had several children, but no property to speak of. John S. Benson and Amanda visited Edward in that year, and brought back to Illinois the plaintiff, who lived with them as one of the family continuously, with the exception of one visit to Virginia, until she was married in 1871. John S. Benson moved to Springfield, Missouri, and plaintiff, who was visiting in Virginia, afterwards came and lived with them some eighteen months.

"At the time plaintiff first went to live with her uncle, she was somewhere between three and six years old. John S. Benson died in Springfield, Missouri, in 1885, seized of considerable real estate in the State of Illinois, and $2,483.60 in personal property as shown by the final settlement of his estate in Missouri. This went to Amanda Benson.

"Amanda Benson afterwards married one Mitchell, whom she survived, and herself died in the beginning of the present year.

"The entire property of the Bensons is of the present value of nearly $150,000. It is not certain where their original property came from, but certain it is that a considerable portion, if not all, had come through the wife. They formerly lived in Louisiana, and may have held their property by the laws of that State, or Mrs. Benson may have inherited their property at the start from her parents.

"The plaintiff, after she became of age in 1871, married one Kinney against the will of John S. and his wife, for which there was an estrangement for some time, but John S. seems to have become reconciled, and after his death Amanda became reconciled also, and a few years before her death paid off a mortgage on plaintiff's property of about $2,000.

"Amanda by her will devised all her property to others than plaintiff.

"Plaintiff claims by this action that at the time she was taken to Illinois, her uncle and aunt contracted with her father and mother that she should be adopted by them, raised and educated as their child, and at their death should have their property.

"Considering the facts, I fully realize the tendency to make false claims of this character against the estates of childless persons. I also realize the fact that in cases where such contracts as the one in question are in fact made, the obligor is ofttimes liable to treat it lightly, and consider it a kind of a moral obligation subject to his will at the varying moods of life. I have not had the advantage of seeing and hearing the more important witnesses, but considering the relationship of the parties, the age of the child, the long distance she was taken, the entire change in her life, the childless condition of John S. and Amanda, and their strong desire to have a child to call their own, the evidence of witnesses to the contract, and the facts and circumstances and conduct of the parties at the time and afterwards, convince me beyond a doubt that they took her with the full understanding that she should have what they left when they were both dead. Mrs. Amanda Benson was at that time, and until long after plaintiff quit their services, a married woman, and, hence, her property was not bound by the agreement. At no time after her discoverture did she ratify or bind herself to it.

"The real estate belonging to John S. Benson at his death was situated in the State of Illinois. Under the laws of Illinois the contract could not be enforced; the decisions of its courts holding it to be within the statute of frauds, which statutes and decisions are pleaded and proven in this case.

"While courts of equity acting on the person may in proper cases define and adjudge the equities of parties before the court to property without the jurisdiction, I hold it would not be right in this case to do so. When the contract was made, it was with a view of residence in Illinois. The property is in Illinois. The evidence that satisfies this court would be incompetent in

Illinois, and I think the well-known law there should be considered here, and with reference to the real estate, should be respected.

"The personal property which Mrs. Benson derived from the proceeds of the farm, being her own, can not be affected by decree in this case, since the plaintiff's right did not begin until her death; and the real estate of John S. Benson, not being subject to the contract, the rents and profits went to Mrs. Benson unaffected by it.

"I therefore hold that while the contract is good and fully established and the services fully performed, the only property which can be affected by this decree is the $2,483.60 received by Mrs. Benson from her husband's estate. This sum in the hands of her executor is charged with the trust created by John S. Benson's contract, and is decreed to plaintiff."

And from the decree rendered in accordance with the finding, the plaintiff alone appeals. The only direct evidence introduced on the trial to prove the making of the contract alleged in the petition were the depositions of two witnesses, Nathaniel J. Ward and Mrs. Sally A. Martin, that of the former taken June 23d and of the latter May 27th, 1897. As set out in the brief of counsel for appellant, that evidence is as follows:

Nathaniel J. Ward testified as follows:

"I was born March 30, 1834; reside at Mappsburg, Accamack county, Virginia, and am a carpenter and farmer. I was acquainted with Edward Benson and Patsy Benson, his wife, in their lifetime, and they had a child named Martha. I never met John S. Benson and Amanda Benson, his wife, but on one occasion. He said he was from Chicago at that time. John S. Benson and Edward Benson were brothers, so they claimed. As near as I can remember, it was in the fall of the year 1857 that they visited here. I was at the house of Edward Benson the day before John S. Benson and his wife were to leave for their home."

Witness was then asked this question:

"You state you were there the day before they were to leave; what, if anything, was said about Martha Benson's or Mattie's going with them, and what conversation, if any, took place at that time in your presence, between the parties, that is, John S. Benson and Amanda Benson, his wife, and Edward Benson and Patsy Benson, his wife, concerning Martha or Mattie Benson?

"I was there, happened there to dinner. Mr. Edward Benson asked me to go there to see his brother, being a stranger; so, I was acquainted with the other brothers, and Mr. Shepard Benson asked Edward Benson's wife, Patsy, if she had concluded to let her have Martha. She says, then, ask Edward, her husband, if he is willing; and Ed. says it is one of the girls and I leave it to you, whatever you say; then she says, I suppose I must let Amanda have her; then it was she says, her clothing, that is wearing apparel, you need not make too much of a bundle of it, you can send very few. I think she said it was a great ways to go and it would be in the way—or something to that amount, and when we get home we will dress her, educate her, and if we die without an heir, without a child, we will give her all of our worth; and she says, won't we Shepard? And he replied back, if we die without an heir, is what he says, she shall have all of our property. Keeley Benson, the brother of Edward Benson, and Mrs. Westcott and her daughter, Sally, now Mrs. Martin, were there at the time. There might have been other ladies and gentlemen there, but I do not remember their names if they were."

Cross-examination:

"I fix the date at 1857, as that was the year that I carpentered and went around the neighborhood, and the year we had a terrible storm. I have no other reason for thinking it was 1857. I did not know that John S. Benson and his wife were visiting Edward Benson until the day before this conversation when I was told so by Edward Benson. I met him in Hadlock, a little village close by.

"What did you and Edward Benson talk about?

"Well sir, it has been so long I don't recollect what the conversation was between any of them. That is, except the conversation at the table. I wouldn't have thought so much about that, but being an uncommon thing, a woman letting her child leave. There might have been a great deal said; talked around the table among the ladies, and I think there was; but I don't recollect the words, or anything like that. The conversation that I have detailed was at the table and during the meal. I don't think there was anything said about how long Martha should remain with them, and there was nothing said about her marriage, when grown, and nothing was said about Martha living with them until they died.

"Now, Mr. Ward, please tell all the conversation that took place at the dinner table between Amanda Benson, John Benson, Patsy Benson and Edward Benson?

"Mrs. Amanda Benson says to Patsy, I suppose you are going to let me have Martha. She says ask Edward, and Edward's reply was if it was one of the boys I would know. It is one of the girls and you can do as you please. Then Aunt Patsy says, I suppose you must have her. She says you needn't bundle up and send too many clothes, it is a right smart ways, and when we get home, we will clothe her and educate her, and if we die without a child we will give her all our property, won't we, Shepard, she says; and Shepard says, yes, if we die without an heir, she shall have all of our property.

"When was Mattie to get this property?

"At their death, I suppose.

"Was she to get anything during their lives?

"I never heard anything.

"Suppose Mattie was to die before them, where was the property to go?

"I don't know. There was nothing said about where the property should go if Amanda died first, and her husband survived her. I didn't hear them say that Martha was to do anything for the property. I never

saw Martha afterwards and did not hear from her, and only lived in the neighborhood about eighteen months thereafter, when I went sailing.''

Mrs. Sally A. Martin testified as follows:

''I am fifty-four years old and reside at Mapps-burg, Virginia. I was acquainted with Mr. and Mrs. John Shepard Benson, and Mr. Edward Benson and Patsy Benson, his wife. They are all dead. John S. Benson and Edward Benson were brothers. The children of Edward and Patsy Benson were Edward, Sarah, Amanda, Mary and Martha. I can't remember the year and couldn't tell the time to save my life, that Martha or Mattie Benson was taken away from here by her uncle, John S. Benson. I remember a visit of John S. Benson and his wife to the family of Edward Benson. It was during this visit that she was taken.

''State in your own way how and when she was taken?

''They taken her as their own child; and to do by her as their own and to give her their property if they had no children of their own. Yes, sir, that is the way she was taken. I met John S. Benson and Amanda, his wife, at Edward Benson's house the day before the child was taken. I do not remember any one being present, except my mother and their family's mother and father, sister and brother, Mr. Shepard Benson and wife, Amanda Benson.

''State, if you know, who were present and heard what contract and agreement, if any, John S. Benson and Amanda, his wife, had with Edward Benson and Patsy Benson, in regard to the adoption and taking away of the child Mattie or Martha Benson?

''I just told you, Mr. Mapp, that they taken the child as their own, to do by her as their own; and to give her their property when they died, if they had no children. This was the contract and was agreed to, and John S. Benson and Amanda Benson took Mattie under this contract. I don't know how old Mattie Benson was. I don't remember.

"What was the child, Mattie Benson, to do under the contract?

"She was to be their own child. Edward Benson owned the farm that he lived on at that time. John S. Benson was looked upon as having lots of property at the time. I am a distant relation on my father's side to the father of the plaintiff. I don't remember how old I was when Mattie left here. I guess I am older than Mattie. I am not sure. I couldn't tell how much older and I don't know how much older I am than Mattie at this time. I couldn't tell whether she was as old as ten at that time or not. I don't know anything more and can't tell anything more. I don't remember the year this visit was made. Have no recollection of the year.

"Then you don't know, of your own knowledge, that she left in 1852?

"I do not.

"Do you know, of your own knowledge, what year she left here?

"I do not.

"It might have been as early as 1850, or as late as 1856, as far as you remember of your own knowledge?

"I don't remember what time it was she was taken away. Edward Benson lived at this time in Northampton county on his own farm. This was the upper part of the county. I guess we lived about four miles from there. We didn't visit them very often, but our families always visited. The first time I met Mattie Benson was the time I met John S. Benson and his wife at her house. I never met her before. I never met John S. Benson before this time. I met them both there for the first time; I do not remember the month. I do not remember the season of the year. It has been so long I don't tax my mind with it.

"Were you and the Benson children playing out in the yard together?

"We were at the dinner table when the words were passed. I don't remember whether we had been playing before dinner or not.

"How long were you and your mother at Benson's that visit?

"Only spent the day there. The way the matter came up, she said maybe she was to blame for giving her child away, being so far from her. I didn't know until I had got there that Mattie was going away. I did not see her start away. I do not know how long John S. Benson and his wife had been there. All the conversation I heard about Mattie going away was at the dinner table.

"Now, Mrs. Martin, give the language of that conversation as nearly as you remember it about Mattie going away?

"Well, they both said these words, they were all talking about it. They would take the child as their own and give the child their property if they had no children, if they would let her go.

"Who said that?

"John Benson and his wife. That was their language to Martha's father and mother.

"Now, Mrs. Martin, please give me John Benson's language?

"Well, I give the language, Mr. Mapp.

"Will you be kind enough to please repeat his language?

"He said we will take Martha as our own, do by her as our own and give her our property when we die, if we have no children. They both said that.

"Will you be kind enough now to repeat the language used by Mrs. Amanda Benson?

"She said the same, we will take Martha as our own, do by her as our own, and give her our property when we die, if we have no children.

"Did they each use this language more than once?

"As well as I remember, they may have done it. I don't say that they did. They were both talking.

"What else did Amanda Benson say?

"I don't remember anything else. She was speaking of packing Martha's clothes, Mrs. Amanda told her it wasn't worth while to pack up very many to carry so

far. She should be cared for. I don't remember anything else that passed.

"Did they say Martha was to have all the property?

"They said she was to have their property.

"Did they say she was to have the property they then owned when they died?

"No, they didn't say that.

"Was she to have anything when Mr. Benson died?

"I suppose she was.

"Did he say she was?

"Of course, he did. I never saw John S. Benson, Amanda Benson or Martha Benson any more. I don't remember when Edward Benson died. I think Patsy Benson has been dead about three years. I don't remember how long Edward Benson has been dead. I can't give the relation between myself and Martha Benson (the plaintiff). It is very distant.

"Did they say in this conversation at the dinner table that Martha was to care for them in their old age?

"I never heard anything like that.

"Was anything said that after they should raise Martha and they should lose their property that she was to care for them if she could?

"I don't remember hearing anything like that. They never said that Martha was to live with them until their death. There was nothing said about when Martha was to leave them, and there was nothing said as to how long Martha was to live with them, that I heard, or anything about her marriage, nor anything about them getting the fruits of her labor, when grown.

"Then as far as you know from the talk between them, Martha would not be compelled to remain with them if dissatisfied?

"I never heard anything about it. I did not see Martha when she came back on a visit. Edward Benson lived near Hadlock at the time of his death. I couldn't tell you what became of his farm. I do not

know what property he had at the time of his death. He died in Northampton county. I don't know how often I have talked with persons about this conversation at the dinner table. I guess I have spoken of it. I don't remember how many years after this conversation until I spoke of it. I heard of the death of John S. Benson. I do not remember who told me. I have never talked with George Benson about his uncle's death. I could give no idea when I first spoke of this conversation. I can't recall any person that I have talked with about it. I never taxed my mind with it. I have not received any letters about this conversation and I have not talked with George Benson about it.

"Have you talked with Mr. Rathbun recently about this conversation?

"Not much.

"Well, did you talk with him?

"Not particular.

"When and by whom were you first told that you would be used as a witness?

"Them words were never said to me that I would be a witness."

Redirect examination:

"You were asked in cross-examination this question: 'Was she [Mrs. Kinney] to have anything when Mr. Benson died?' Give your answer in full as you desired to give it a little while ago?

"They both agreed to give her their property when they died. That was the way they taken her."

Recross-examination:

"Please explain, Mrs. Martin, what you mean by the language 'their property at their death?':

"I mean they meant to give it to her at their death. That is what they meant.

"Well, suppose they didn't die together?

"Shouldn't think that made any difference. She ought to have their property, I should think.

"Well, suppose Mr. Benson should die first, what was the talk as to where his property should go?

"She would get it all, his and hers, was the way

they were talking. I was born on the 4th day of October, 1845.''

The plaintiff's contention, in substance, is, that in this evidence and in the subsequent declarations and conduct of the parties as testified to by other witnesses, whose evidence, as far as is necessary, will be noticed in the course of the opinion, is to be found sufficient evidence of a contract which can and ought to be specifically enforced in a court of equity in Missouri against the defendants—sufficient evidence of a contract not made by Amanda Benson who was *covert* and incapable of contracting, but by John S. Benson who was *sui juris* and of sound mind, of an *irrevocable* contract; whereby the said John S. Benson agreed to devise and bequeath all of his property to the plaintiff in the event that he and his *then* wife should have no natural child born of their marriage, which ought to be enforced by a court of equity in Missouri, although void by the positive law of this State, of the State of Virginia in which it is alleged to have been made, and of the State of Illinois where the party sought to be bound was domiciled, and his property was situate—and although, such a contract, if proven, would not be enforced by the courts of equity of either Virginia or Illinois.

A court of equity in this State will specifically enforce an oral contract to make a will in a particular manner, where a valuable consideration has been received for the promise and a fraud would be perpetrated upon the promisee or beneficiary unless the contract be performed. But, the proof of such a contract must be so cogent, clear and forcible as to leave no reasonable doubt in the mind of the chancellor as to its terms and character; and where the consideration consists of acts to be performed, there must be like proof that the acts performed refer to and result from that contract, and are such as would not have been done unless on account of that very agreement and with a direct view to its performance. ''There must be no equivocation or uncertainty in the case.'' This doctrine is

established, and its application illustrated, in a long line of cases. [Charpiot v. Sigerson, 25 Mo. 63; Wright v. Tinsley, 30 Mo. 389; Gupton v. Gupton, 47 Mo. 37; Sutton v. Hayden, 62 Mo. 101; Sitton v. Shipp, 65 Mo. 297; Sharkey v. McDermott, 91 Mo. 647; Davis v. Hendricks, 99 Mo. 478; Rogers v. Wolfe, 104 Mo. 1; Teats v. Flanders, 118 Mo. 660; Nowack v. Berger, 133 Mo. 24; Alexander v. Alexander, 150 Mo. 579; Steele v. Steele, 161 Mo. 566; Lynn v. Hockaday, 162 Mo. 111; McElvain v. McElvain, 171 Mo. 244.] To which others might be added.

When, as in this case, and in consonance with this doctrine, a court of equity is called upon to establish and enforce a contract of this character, in the teeth of the statute of wills, and of the statute of frauds and perjuries, and to set aside the disposition of valuable property made in conformity with the requirements of those statutes, there is devolved upon the chancellor the gravest responsibility, perhaps, that ever attaches to his high office. And nothing short of the inherent justice of the claim, supported by evidence that can be relied upon with the utmost confidence, proving the existence of the contract, its terms and conditions and a substantial and meritorious compliance therewith, with such certainty and definiteness as to leave no room for reasonable doubt, can ever justify the exercise of such an extraordinary prerogative.

Can such a claim, and such proof, be found in the evidence before us in this case? It covers about two hundred pages of the printed abstract. It consists largely of loose statements, and fragments of conversations, testified to from thirty to forty years after they are said to have occurred, much of it hearsay, and much of it incompetent for other reasons. The case in the main, made by such of it as is competent and may be relied upon with a reasonable degree of confidence, may be briefly stated as follows:

In the years 1855 and 1856 John S. Benson was residing in the town of Lacon, in the county of Marshall, in the State of Illinois. He owned a house and lot in

the town, a farm in the neighborhood, and some unimproved land, his estate being then of the probable value of ten or twelve thousand dollars. He was a jeweler by trade, lived in town and rented his farm. He was a Virginian by birth and education, was a "good business man." His family consisted of himself and wife. They had no children, nor ever had a child. Sometime in one of those years, he and his wife made a visit to his relatives in Virginia, among whom was his brother, Elward S. Benson, then residing with his family, consisting of a wife and five young children, on a small farm in Northampton county, Virginia. The plaintiff was one of those children; was then about seven or eight years old; and upon the termination of this visit accompanied her uncle and his wife on their return to their home in Illinois, and thereafter continued to live with them as a member of their family, until about the year 1867, when she returned to Virginia in company with her Aunt Amanda, wife of John S. Benson, and thereafter remained with her parents and kinfolk in that State for about three consecutive years. In the meantime the said Amanda after a short visit in Virginia returned to her home in Illinois, and thereafter, in or about the year 1868, she and her husband moved their home from Illinois to Springfield, Missouri, where they thereafter continued to reside for the remainder of their lives. About the year 1870, the plaintiff came to them again, in Springfield, Missouri, and thereafter continued to live with them as before until October 1, 1871, when clandestinely, without their consent and against their wishes, she married Jerome Kinney, and thereafter "went her own way," leaving the old couple to "totter down the hill together" without her. They were very much aggrieved at her conduct in the matter, and the intimate relation that had theretofore existed between them and the plaintiff, was at once broken up, and was never thereafter resumed. After the lapse of some years, however, they became friendly with each other, and later Mrs. Benson assisted the plaintiff pecuniarily, at one time paying off a mortgage of nearly

$2,000 on her home. During the time the plaintiff lived with her uncle and his wife, she performed such services in his family as ordinarily would be performed by an only daughter in the family of a man in his situation, station and circumstances of life, in the locality in which they lived. She seems to have been reasonably affectionate, dutiful and industrious, called them "uncle and aunt," and was fully cognizant of her status in the family. On the other hand, she was treated by her uncle and his wife with uniform kindness and affection, was maintained, clothed, and educated, as ordinarily would be the only daughter of a man in his condition and circumstances in the locality in which he lived, and when she was absent with her parents and other relations in Virginia, he furnished her money as she needed it, and when she desired to return to his home in Springfield, Missouri, furnished her with the necessary means to do so.

The acts performed as above stated constitute the acts of part performance relied upon to take the case out of the statute, and while it may be readily conceded that they point to some agreement or understanding between John S. Benson and plaintiff's parents in regard to her future, they do not by any means point with any degree of certainty to such an *irrevocable contract* as is claimed in this case. Nor do they furnish a very broad, equitable basis for a claim to an estate of more than a hundred thousand dollars, in addition to "the just recompense of reward" which she and her parents evidently received for everything they in fact ever did or gave. For the equity of such a claim, and the proof required to sustain it, we must evidently look farther.

Can they be found in the history, relations, character, conduct, situation or circumstances of the parties alleged to have entered into this extraordinary contract? If such a contract was ever entered into, it must, of course, have been between John S. Benson and his brother Edward, who were the only parties having the legal capacity to make such a contract.

The evidence tends to show that John S., who was

familiarly called Shepard by his kinsfolk, was the older
of the two brothers.    That they with two other brothers
were born and reared on a farm in Northampton county,
Virginia, where Edward married and continued to re-
side during the remaining years of his life. . That at
the time when it is alleged this contract was entered
into, Edward was living with his family on a poor little
farm of 77 acres in that county, which formerly be-
longed to his father, and which was incumbered by a
deed of trust for more than it was worth, under which
it was subsequently sold, and when he thereafter died
he had nothing left except his household goods and
farming implements, and in the course of time there-
after his wife became to some extent a pensioner upon
the poor fund of the county.    That his family then con-
sisted of himself, his wife and five young children, one
boy, Edward, older than the plaintiff, and four girls
of whom the plaintiff was the oldest.    There had been
another son, Shepard, probably older than Edward, Jr.,
who had died previous to this visit of his brother John
S. and wife to Virginia.    That John S. Benson, left the
old homestead in early life, went out into the world to
seek his fortune, became a ''jeweler,'' at which trade
he was working in New Orleans, when his employer
died leaving a widow without children, whom he there-
after married, and by whom he received some estate.
with which he and his wife in the early forties came to
Lacon, Marshall county, Illinois, where he established
himself in business, invested his means, and laid the
foundation of the fortune which he afterwards acquired.
The evidence tends to prove that he was an honest, in-
telligent, industrious, prudent, economical man; kind
to every one, just in his dealings, devoted to his wife,
helpful to his aged and needy parents, and disposed
to assist his poorer brother, and when he visited that
brother in 1855 or 1856, saw and realized his situation,
struggling for a bare living, burdened with debt, and
a large and helpless family; being childless himself, it
was the most natural thing in the world, that he should
propose to take one of his brother's helpless girls off

his hands, and give her a home in his own family, where she should be reared and provided for as if she was his own daughter. That such a proposition, involving no severance of parental ties, no change of name or relation between her and her parents, no diminution of filial affection or allegiance, nothing in fact except her absence from the parental roof, for an indefinite number of years, to be spent as a member of the family of his beloved elder brother, her uncle by blood, in whom he had entire confidence, and who, he knew, was able and disposed to do more for her than he possibly could, should under the circumstances, have been accepted by Edward Benson, is not only natural but entirely reasonable, and is the sort of agreement to which all the facts in the case, established by reliable testimony, point with a reasonable degree of certainty. That the agreement was reached only after due consideration by the two brothers, and much talk between them and their affectionate and worthy wives in the privacy of their domestic circle, we can feel well assured, but we can not feel at all assured that its terms were disclosed, or intended to be disclosed to a promiscuous company in the desultory conversation about the clothes she should take with her, at the dinner table, on the eve of her departure from Virginia, of which the two witnesses, whose evidence has been set out, undertook to give an account more than forty years after its occurrence, one of whom was then a child about ten or eleven years old, the other a peripatetic house-carpenter of twenty-one or twenty-two who afterwards "went sailing."

That thereafter the plaintiff should have dwelt in the family of her uncle and his wife and for twelve or fifteen years should have been treated by them as they would have treated a daughter of their own, and that during that period she should have dwelt in their minds as their expectant heir, in the popular sense of the words, and in casual conversations should have been spoken of as such, or in terms to convey that idea, is entirely natural and reasonable and consistent with the

agreement hereinbefore suggested, and to which all the other facts in the case point with reasonable certainty. But that John S. Benson should have entered into an absolute and irrevocable contract with the plaintiff's parents, by which he in effect agreed to elevate her to a plane in his life above that which would have been occupied by his own daughter, if he had had one, to renounce in her favor his right to make a testamentary disposition of his property, and thereafter to hold for himself and wife only a life estate in all that he then owned, or might thereafter acquire, at the termination of which all should become the absolute property of the plaintiff, is not only unreasonable but inconsistent with all the ascertained facts of the case, and is pointed to by no evidence, except in a vague and indefinite way, by the attempted repetition of oral statements said to have been made by Mr. and Mrs. John S. Benson, in casual conversation had thirty, forty and more years before they were testified to, which, leaving out of view the real facts of the case, might be susceptible of such a construction. So far as these statements are concerned many of which were not even admissible as evidence, it is only necessary as to such as were admissible to repeat what has been so often said and approved by this court: ''Evidence of such declarations, it is true, is admissible, but it never amounts to direct proof of the facts claimed to have been admitted by those declarations; and it is sometimes doubted whether it ought to be received at all when introduced for the purpose of divesting a title created by deed.'' [Johnson v. Quarles, 46 Mo. l. c. 427.] ''This kind of evidence has always been received with great care, and when not supported by other evidence is generally entitled to but little weight.'' [Cornet v. Bertelsmann, 61 Mo. l. c. 127.] ''The evidence, consisting as it does, in the mere repetition of oral statements, is subject to much imperfection and mistakes, the party himself either being misinformed or not having clearly expressed his own meaning, or the witness having misunderstood him. It frequently happens also that the witness, by unintention-

ally altering a few of the expressions really used, gives an effect to the statement completely at variance with what the party actually did say. . . . When we reflect upon the inaccuracy of many witnesses in their original comprehension of a conversation; their extreme liability to mingle subsequent facts and occurrences with the original transaction, and the impossibility of recollecting the precise terms used by the party, or of translating them by exact equivalents, we must conclude there is no substantial reliance upon this class of testimony." [1 Greenleaf, sec. 200; Johnson v. Quarles, supra; Ringo v. Richardson, 53 Mo. 385; Cornet v. Bertelsmann, supra; Berry v. Hartzell, 91 Mo. l. c. 137; Fanning v. Doan, 139 Mo. 392.]

"The intrinsic weakness of this class of evidence is further enhanced in any given case by the length of time that has intervened since the declarations were made, and the ease with which it can be manufactured, and the temptation to do so, when all those by whom it could be contradicted are in their graves." [Fanning v. Doan, 139 Mo. l. c. 412.] Such evidence can and ought to have very little weight, when it is sought by it to asperse the memory, and set aside the last will and testaments of worthy and just persons, executed in contemplation of death, and in the manner required by law, disposing of their own property according to the dictates of their own conscience. There is no sufficient reasons shown why John S. Benson should have made such a contract. The reliable evidence fails to satisfactorily show that he ever did make such a contract, and there is no inherent equity in the case demanding the specific performance of such a contract, even if it were within the power of a court of equity in this State to enforce it to the extent demanded on this appeal. In this view of the case, to which we are constrained by a patient review and careful consideration of all the evidence; on which we are in just as good a position to pass as was the chancellor below, and upon which we must return a finding upon our own conscience (Benne v. Schnecko, 100 Mo. 250; Blount v. Spratt, 113

Mo. 48; Parker v. Roberts, 116 Mo. 657; Lins v. Lenhardt, 127 Mo. 271; Dalrymple v. Craig, 149 Mo. 345; Taliaferro v. Evans, 160 Mo. 380), it becomes unnecessary to consider the other questions so ably discussed on either side in the briefs of the learned counsel in the case, and hence dispose of it by holding that the chancellor erred in his conclusion that the existence of the alleged contract was proven by adequate evidence, and in not dismissing the bill for want of equity. So far as the error was carried into the decree it was an error in favor of the plaintiff, and as the defendants did not appeal, that error can not now be corrected on this appeal. The result, therefore, is that the degree of the circuit court as it stands must be affirmed, and it is accordingly so ordered.

All concur.