JACOB GERSHON, APPELLANT, v. SAUL ASHKANAZIE, IRVING ASHKANAZIE AND SADKA ASHKANAZIE, RESPONDENT.—199 S. W. (2d) 38.

Kansas City Court of Appeals. Opinion filed November 18, 1946

*Schultz & Bodney* and *Walter A. Raymond,* for appellant.

*A. J. Granoff,* for respondents.

BOYER, J.—In an action to recover the balance said to be due on a promissory note plaintiff alleged that he was the innocent and *bona fide* holder in due course of a note in the face amount of $3000, dated July 22, 1943, executed by the defendants and payable to one Bernard Gershon; that on or about the 14th day of September, 1943, for valuable consideration said Bernard Gershon endorsed, sold and transferred said note to plaintiff; that the note was due five and one half months after its date and bore interest at the rate of 3 per cent per annum; that there was an unpaid balance of $850 principal and $135 interest; that the note was past due; that demand for payment had been made, but defendants failed and refused to pay.

The answer denied that plaintiff was the owner and holder of the note and alleged that the named payee, Bernard Gershon, loaned defendants the $3000 evidenced by said note, but charged them $1000 interest for the use of said money for a period of five and one half months; that as part of the same transaction and at the same time said note was executed, defendants executed to said Bernard Gershon another note for the sum of $1000 to evidence said interest indebtedness; that said transaction was usurious; that plaintiff was the father of said payee, Bernard Gershon; that plaintiff at all times knew of the usurious agreement and that if plaintiff was the owner and holder of said note, which defendants deny, he acquired the same with knowledge it was executed and delivered pursuant to a usurious agreement.

The reply was a general denial.

By agreement the case was tried to the court without a jury, and it was further agreed that the parties waived any right to submit oral testimony and that the case be submitted both as to plaintiff and defendants on depositions taken by the respective parties. Pursuant to said agreement, plaintiff offered in evidence the depositions of plaintiff and Bernard Gershon previously taken at the instance of defendants; and defendants offered in evidence the depositions of Saul and Irving Ashkanazie which had been taken by agreement and at the instance of plaintiff's attorney. Defendant Sadka Ashkanazie signed the note in question as surety but did not testify, and further reference to his interest in the case will be unnecessary. In the interest of brevity, we will refer to Jacob Gershon as plaintiff, and to Bernard Gershon, his son, as Bernard, and to Saul and Irving Ashkanazie as Saul and Irving.

All of the parties resided in Kansas City, Missouri. Plaintiff had been engaged in the real estate business for many years and his son, Bernard, was about 25 years of age. Saul and Irving were engaged in merchandizing under the corporate name of A & A Linen Outlet, Inc., with an established place of business at 1108 Main Street. They de-

sired to open an additional store, and in contemplation thereof obtained a lease on premises at 1020 Main Street. They were in need of additional capital in the promotion of their enterprise and with a view of obtaining it contact was made with Bernard, and it was proposed that he become a partner in the new store on a specified basis and furnish three or four thousand dollars. Irving first approached Bernard on the subject. They were constant companions and had been for several months. Bernard and Saul were also good friends and exchanged visits in each other's homes. Saul and Irving approached Bernard, suggesting that he put three or four thousand dollars into the business and become a partner in the new store on the basis of 60% interest to Saul and Irving, and 40% interest to Bernard. Bernard considered the matter for several days and finally solicited his father, the plaintiff, for a loan of $4000 to invest in the business and become a partner on the above basis. Plaintiff thereafter discussed the situation pertaining to the prospects of the business and the prospects of his son entering the business with both Saul and Irving to the end that his son would become a partner in the business. There was no discussion with the plaintiff in reference to a loan. Following such discussions, plaintiff gave Bernard a check for $4000 to be invested in the business on the basis discussed between the parties. These discussions extended over a period of about a month, during which time the defendants obtained a lease on the store building at 1020 Main Street, and on July 22, 1943, Bernard gave Saul and Irving a check for $3000 which was deposited to their credit, and on the same day took the note sued on for the principal sum of $3000, with interest from date at 3%, payable at maturity. The note became due five and one half months after date. At the same time, Saul and Irving also executed and delivered to Bernard their promissory note in the principal sum of $1000, bearing 2% interest and to be paid $200 on the 22nd day of August, 1943, and $200 on the 22nd day of each succeeding month thereafter until the whole sum named was fully paid. Payments were made by Saul and Irving on said note for $1000 at various times until it was fully discharged; and thereafter they made numerous payments on the note for $3000, either to plaintiff or to Bernard in plaintiff's behalf, until the principal was reduced to the amount now claimed by plaintiff. All of the foregoing facts are recited because they are not in dispute. Numerous exhibits were also presented to the court, consisting of the two notes referred to and various checks and receipts evidencing payments upon said notes.

At the conclusion of the evidence, and upon submission of the case, the trial judge took the cause under advisement, and on the 25th day of January, 1945, rendered judgment in the case in which it is recited that the court found the issues for the defendants, and it was therefore adjudged by the court that plaintiff recover nothing and that defendants be discharged with their costs and have execution therefor against the plaintiff. The record does not show what facts were found by the

trial judge, but in order to support the judgment which was rendered it would be essential to find that the evidence established usury, and that plaintiff had notice of that infirmity before or at the time he became owner of the notes as alleged in the answer of the defendants.

In considering the validity of the finding upon the issues made by the trial judge and the judgment rendered, we start with the proposition that the burden of proof upon the affirmative defenses raised by the answer was upon the defendants, and that such proof must be clear and convincing. [Zancker v. Northern Insurance Company of New York, 176 S. W. (2d) 523, 527; General Motors Acceptance Corp. v. Weinrich, 218 Mo. App. 68, 262 S. W. 425, 430; Tower Grove Bank & Trust Co. v. Duing, 346 Mo. 896, 902, 144 S. W. (2d) 69, 72; Hansen v. Duvall, 333 Mo. 59, 71, 62 S. W. (2d) 732.]

The determinative question for this court to answer upon this appeal is this: Does the evidence by a clear preponderance of the proof justify a finding in favor of defendants upon the issues raised by the pleadings? The case is here for decision in accordance with the provisions of Sec. 114 (d) of the new Civil Code, as shown in Laws of Missouri 1943, page 388, which provides in part that in cases tried upon the facts without a jury "the appellate court shall review the case upon both the law and the evidence as in suits of an equitable nature. The judgment shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." More shall be said hereafter in reference to the contention in respondents' brief as to the meaning and effect of the above quoted provision. We may say now, however, that the case is here for examination and decision both upon the law and the evidence as in equity. We shall set forth that part of the testimony of the various witnesses which we find to be particularly relevant and material to the questions of fact in issue and which may also have a bearing upon the credibility of the witnesses.

Plaintiff testified that he obtained the notes in question from his son in August or September, 1943; that Bernard owed the $4000 which he had advanced, and other money besides; that he took over both notes to apply on the indebtedness of Bernard to him. "Q. Do you know anything Mr. Gershon about how or why the Ashkanazies gave Bernard those two notes? Do you know anything about that? A. Well, all I knew, they dissolved partners and they gave him those notes back. I don't know how it happened. All I know when the partnership blew up, you know, why, they gave him notes, and so I got those notes back on those payments when he owed me the money, what I gave him, on the four thousand dollars."

Plaintiff further testified that he gave Bernard $4000 to be used by him to go into a partnership; that before he advanced the money he made inquiry of the Ashkanazies, and they explained to him what they could do and how much money they could make; that after he

had issued his check to Bernard he made further inquiry as to whether or not he had become a partner, and they told him that Bernard was a partner; that he had put $4000 into the business, and that Bernard told him the same. Plaintiff was asked if he did not know his son had advanced only $3000 and not $4000 to the Ashkanazies. Plaintiff replied that the only way he found out was through his attorney in whose hands he had placed the note for collection after defendants had refused to pay the balance due, and that his attorney informed him that the defendants were claiming they had received only $3000. Plaintiff was asked when he first found out that Bernard had two notes from the Ashkanzies. He said that six or eight weeks or maybe a month later, when he did not know that Bernard was not a partner, he went to the store and either Irving or Saul told him that Bernard was no longer a partner because he could not stay in the store and they did not want to be partner with him. He then asked Bernard about it, and Bernard said: ''That is right, they paid me out,'' and that plaintiff then demanded the notes from his son and obtained them. He then called up Saul and told him not to make any more payments to Bernard because the notes belonged to plaintiff. Plaintiff said his son told him that he got the notes in payment for his partnership interest in the business. Plaintiff visited the new store frequently and saw his son there at work. Later on he made several visits at the store, but his son was not there. He inquired about it, whether Bernard was a partner because he did not see him there in the last two or three visits, and Irving said: ''No, Bernard is no partner, we bought him out.'' Plaintiff said that Bernard explained to him that the reason he gave defendants only $3000 to go in the business was because they owed him $1000 for money he loaned to them and that was counted as part of the money which he was to put in the business. Plaintiffs aid that at the time he received the note for $100, Bernard had already collected four or five hundred dollars on it, and that defendants paid him the balance of that note and he delivered the note to them. It was agreed that the note for $1000 was paid in full.

Bernard testified that he had been approached by Irving to enter business with the defendants and that he had an oral agreement with them to enter into a partnership on a 60-40 basis; that he was to put $4000 into the business and the defendants were to up an equal amount in value of money or merchandise; that the defendants had procured a lease on the store building and he believed they had obtained the lease before they approached him about the partnership. In reference to their personal services in the store, Bernard testified they had sort of a tentative agreement that each should give his services to the store and should draw $50 a week out of the business for personal services, and that he was to assist in the store as a salesman; that they had reached such an understanding about the 10th or 15th of July; that thereafter he assisted in bring in merchandise into the store; supervised the construction of wall cases and partitions, and

1018

assisted in buying all that was incidental to setting up the store; that he worked there three or four weeks; that he did not draw any pay for that time as they wanted to get the store in shape for business, and that he was there only five or six days after the store was open for business; that on the 22nd of July, he gave Saul a check for $3000, and at that time Saul and Irving gave him a note for $1000 which had been advanced to them over a period of five or six months in cash; that he used to assist them in their store and was their constant companion at home and at various social events; that he would give them one, two or three hundred dollars any time they asked for it; that he didn't receive any evidence of debt from them, but kept a personal memorandum in his billfold; that he trusted them completely; that on the 22d of July, 1943, Saul and Irving agreed that they owed him $1000, and that it would·be considered as an investment in the partnership, together with the $3000, making the total $4000. Bernard positively denied that the note for $1000 was given for the loan of $3000; that the notes were given pending the writing of necessary legal papers for a partnership, but that no written agreement was ever entered into; that he did not intend to collect any interest if he went into the partnership.

Bernard further testified that shortly after the 22nd of July, 1943 he was approached by Saul who told him that the business was not big enough for both and that he, Bernard, was out of the partnership. Bernard then walked out, but said he did not do so willingly, and that he was ashamed to tell his father what had occurred, but shortly afterwards he did tell his father what had happened upon inquiry from his; that his father said he had made a very poor deal and that he wouldn't have approved it; that his father then demanded the return of the money which he had advanced to him to go into business; that he then turned the notes over to his father as part payment on debts which he owed him; that he owed his father money in addition to the $4000 which he had received; that the notes were delivered to his father as security for and· to reduce his total indebtedness to his father. The notes mentioned in evidence showed that they were endorsed to J. Gershon, and bore the date 9-7-43.

Saul testified that he had known Bernard Gershon intimately for about three or four months prior to the execution of the notes and that he met him through his brother; that there was a discussion about a contemplated partnership probably a couple of weeks before they leased the store; that the substance of the conversation about the proposed partnership, he did not remember, whether it was two thirds and one third, but it was purely in the negotiating state and was subject to the approval of his attorney and to a written agreement, and that was all there was to it so far as the partnership was concerned. He further said: "I frankly was all for it," and that he discussed it with his attorney several times who was opposed to it and would not advice a partnership with anybody; that notwithstanding his attor-

ney's opposition, he insisted that he "make a partnership agreement" and that he would assume the responsibility; that he discussed it further with Bernard; that they left the store at 1020 Main Street to go to the attorney's office to make the agreement as to the partnership; that on the way there was further discussion with Bernard about some other way whereby he could be guaranteed a compensation without taking any risk at all, and that he and Bernard finally agreed that he would take $3000 and Bernard would receive $1000 interest or whatever you might call it, and would consider it as an income of $50 a week or $200 a month until January; that they would pay the $3000 principal in a lump sum; that he received a check for $3000 from Bernard and deposited it in his account. Saul further said that Bernard led his father to believe that in taking $4000 from him, he was a partner; that his father came in two or three times to see if he was in the store and to see if he was taking an active part or not. He noticed that Bernard was not there and got suspicious, "and then he called my brother over to his house and wanted to know the actual facts because he though he didn't know the whole truth from his son so my brother told him at that time actually what happened; that we never entered into a partnership and that the only transaction we had with Bernard, he gave us $3000 and we gave him $4000 in notes, that is all there was to it." He testified that after the notes were made, Bernard continued to come to the store for two or three weeks, but never actively engaged in any business for the partnership; that the notes were given the same day the check for $3000 was received; that up to the time the notes were signed the understanding was they were to go into a partnership; that he knew Bernard was interested in going into business, and that he had borrowed money from his father for that purpose and showed him a check for $4000; that he understood Bernard had told his father he was going to use this $4000 to go into business with him; that he got that information from Bernard. "Q. And I presume you discussed it with his dad too? A. Well, before he got the money his father discussed it with myself and my brother on the business prospects and on the prospects of him going into business with us." He said he did not discuss any loan with the father; that he took a lease on the new store about July 12, and got possession about that time, and that Bernard might have helped some in fixing up the place. "We never considered him qualified to, capable to work with us and contribute sufficient time as we would ourselves, and that is one of the reasons that we didn't want to go in a partnership with him, because he was green. He didn't know anything about the business and the fact that he would never keep appointments and things of that sort. We just thought that it wasn't a good thing to go in partnership with him." He also said that the discussion about a partnership arrangement covered a period of probably a couple of weeks before they leased the new store, and that the total period of such discussion covered approximately a

month or so for the reason that Bernard was waiting for his father to give him the money with which to go into business; that he thought Bernard's father made arrangements for light at the store so it wouldn't be necessary for them to put up a deposit.

Saul was asked about the state of his credit at the time with his merchandise creditors and said: ''Well, some would give us a substantial credit and some wouldn't, and in some cases there was a shortage of merchandise. We would have to pay cash for the goods and that is why we agreed to pay such a price for obtaining three thousand dollars from Bernard Gershon.'' He said he was not in desperate financial straits; that he considered his credit was sound; that he was solvent at the time he got the money from Bernard, and that his assets were greater than his liabilities; that at the time Bernard knew that he, Saul, needed cash badly because he had purchased merchandise in New York and paid a deposit on it; that it had been shipped here C. O. D. and could not be taken out and put in the store without cash to pay for it; that he didn't try to borrow money anywhere else; that he had borrowed money from the bank previous to this loan, but needed more money; that he had never before paid above the legal rate for loans; that approximately a couple of months after the notes were signed, plaintiff advised him that the notes had been transferred to him and not to make any more payments to Bernard except upon his order; that $337.50 had been paid to Bernard while he was still in possession of the notes; that thereafter the father had possession of the notes and payments continued to him, or to Bernard for plaintiff when plaintiff requested it. Saul testified again about how plaintiff found out about the actual situation and said: ''Well, the way he found out about it when he questioned us whether his son was a partner or not and we told him exactly what happened, that he was not a partner, that he invested or gave us three thousand dollars with a thousand dollars additional as interest or compensation for him personally.''

Irving testified that he had a discussion with Bernard about opening up a new place and a partnership being formed with Bernard one of the partners; that he also discussed it with Bernard's father before his father would give him the money to go into a partnership; that plaintiff called him and asked him to come to see him; that he went to plaintiff's home and plaintiff asked him if he though Bernard would work in the store becaues he wasn't doing anything and he wanted to keep him out of mischief, and that he told plaintiff he thought Bernard would take an interest in the store, and a few days later he understand that his father gave him money to go into a partnership; that he told the father the amount that would be necessary for Bernard to put in would be three or four thousand dollars; that at the time he discussed the matter with plaintiff there was nothing said about executing a note and nothing like that was said; that up to the day the notes were signed there was going to be a partner-

ship; that there were two obstacles to a partnership; their attorney was definitely against it and Bernard himself lost interest in the partnership and desired a different arrangement; that the idea of forming a partnership was dropped on the day the notes were signed. "We couldn't get Bernard to go into partnership with us. We needed the money so badly because we had merchandise in storage which required about $3,000.00"; that Bernard knew they needed money badly, and when the partnership fell through they suggested to Bernard that he loan them $3000, and Bernard said if he wasn't going into the partnership he would want his money to earn a certain amount of income; that there had been no talk of a loan before the day the notes were signed.

Irving further testified that plaintiff would come to the store practically every day to see if Bernard was there; that he would come in and see that he wasn't there and ask where he was, and when told he wasn't in the store he would leave; that about a week or ten days later he told plaintiff that Bernard was not a partner and plaintiff asked him: "What did he do with the money? And I told him that he had loaned us three thousand dollars and that he was to get a thousand dollars interest." He said that plaintiff didn't ask for any details and left. Irving was unable to state with any degree of certainty as to how he fixed the time of this conversation, but claimed that it occurred about a week or ten days after the notes were signed; that he had no further discussion with plaintiff about the matter but continued to make payments to the father on the notes; that plaintiff told him he owned the notes, but he could not state when it was, but said it was about a month or a month and a half later.

Both Irving and Saul very positively denied that they were indebted to Bernard in the sum of $1000 for money advanced to them, or that the $1000 note was executed for that reason. The notes referred to, together with a number of receipts and cancelled checks which were given as payments by the defendants on the notes, were presented here as exhibits in the case. Such exhibits show that after January 3, 1944, the defendants made a total of eighteen payments to the plaintiff, or to Bernard for the plaintiff, most of said payments being for the sum of $50.

We approach the decision in this case in view of the provisions of Sec. 114 (d) of the Civil Code of Missouri, heretofore referred to, and with the view that this court is charged with the duty and responsibility of weighing the evidence; and that it is not bound by any conclusions reached by the trial court either as to the facts or the law, and that this court must return a finding upon its own conscience. [Bank of Brimson v. Graham, 335 Mo. 1196, 76 S. W. (2d) 376, 380; Kinney v. Murray, 170 Mo. 674, 71 S. W. 197; May Department Stores Co. v. Union Electric Light & Power Co., 341 Mo. 229, 107 S. W. (2d) 41; Kuhn v. Zepp et al., 196 S. W. (2d) 249.]

It is stated in respondents' brief that there is no dispute between the parties as to the applicable law which is correctly stated by appellant, namely: (1) that the defense of usury must be specifically pleaded and proved; (2) that usury must be established by a clear preponderance of the evidence; and (3) that respondents had the burden of proving by a clear preponderance of the evidence that Jacob Gershon had notice of the notes' infirmities, i. e., usury.

After careful examination of the evidence in this case in an effort to assay the testimony of the witnesses with a view of determining its true value, and in considering matters affecting the credibility of witnesses, we have reached the conclusion that a finding that the note in suit was infected with usury cannot be made without accepting as the absolute truth and at its face value the testimony of the two defendants that they borrowed $3000 and agreed to pay $1000 as interest thereon for the use of the said $3000 for five and one half months. We think such testimony cannot be accepted as true under the admitted facts and other evidence in the case. It is incredible that they would obligate themselves in that manner when their business was sufficiently prosperous that they deemed it advisable to establish two stores instead of one, and when their credit was good and they were solvent at the time. Respondents complain bitterly that under the arrangement made they were obliged to pay 60% interest. As a matter of fact, if what they say is true, an agreement to pay $1000 for the use of $3000 for five and one half months would be equivalent to more than 70% per annum for the use of the money. An attempt to swallow such testimony as the truth would choke the gullet of belief. Such a transaction as that described by the defendants is wholly contrary to the common experience of men in the business world. Saul testified that he had previously obtained loans from the bank, but had never paid more than a legal rate of interest; that his credit was good and he was solvent, and while he needed money at the time he made no effort to borrow from any one else, but made the deal which he described with Bernard. There is no showing whatever in this entire record that the amount of money which the defendant required for the conduct of their business could not have been obtained by them in the usual and ordinary manner and at a legal rate of interest.

There is another aspect of this case proper to take into consideration in evaluating the testimony of the witnesses and determining its credibility, and that is in reference to the manner in which the defendants obtained three thousand dollars of plaintiff's money for use other than plaintiff intended it. It is clearly established that both Saul and Irving were instrumental in encouraging Bernard with the prospect of a partnership in the business and in inducing his father to advace money for that express purpose, and with a view of establishing his son in business. There never was anything said by either

of them to the plaintiff in reference to a loan of money instead of Bernard investing it for the purpose of obtaining a partnership. Defendants were strong for the partnership idea and so represented to the plaintiff up until the very day they took $3000 of his money from Bernard and then refused to make a partnership agreement. They knew as well as any one could know that plaintiff advanced his money for a definite and specific purpose, and they never at any time suggested to him that there be a change in the arrangement which he understood would be made. Instead of consummating a partnership, they took the money as a loan, and neither Bernard nor the defendants informed plaintiff of what had actually transpired until he insisted upon an explanation. Such conduct cannot be jusified. It brands the testimony of defendants with discredit and reflects most unfavorably upon the character and credibility of the witnesses.

Respondents claim that Bernard deceived his father in obtaining and applying the money which had been advanced to him. This record clearly shows that the defendants were parties to such deception and that they and Bernard are tarred with the same stick in that respect. The weakness of the testimony of Bernard does not in any manner lend force or strength to that of the defendants. There is some evidence which indicates that the $1000 note was given Bernard as personal compensation to him at the time defendants refused to execute a contract of partnership. Saul in effect so testified when he said the $1000 was given as interest or compensation for him personally. There is no denial or dispute that the defendant definitely and specifically promised Bernard the right of a partnership in their business and led him to believe that he would be a partner up to the very day they received the money from him. He had been in the store for several weeks and defendants had represented to plaintiff that he was a partner and had invested $4000 in the business. At that time and under such circumstances, Bernard had some enforceable legal rights, clearly on the theory of promissory estoppel, and a relinquishment of such rights would be a good consideration for the $1000 note. Plaintiff said that Irving stated to him that they had bought Bernard out; and Bernard reported to his father that "they paid me out." [Sec. 90 Restatement of the Law of Contracts, page 110; 60 C. J. page 960.]

The note for $1000 and the note for $3000 recite that they were given "for value received." Our statute, Sec. 3040, Revised Statutes Missouri 1939, provides that every negotiable instrument is deemed *prima facie* to have issued for a valuable consideration and every person whose signature appears thereon to have become a party thereto for value. Sec. 3041 provides that value is any consideration sufficient to support a simple contract. Furthermore, Sec. 3345 provides that all instruments of writing made and signed by any person whereby he promises to pay money

shall import a consideration and be due and payable as therein specified. It has been adjudged that this last provisions applies to all contracts in writing, whether negotiable or non-negotiable, and that under this section the law imports consideration in the absence of affirmative proof to the contrary, even though one is not recited in the writing. [Scottish Rite Temple Assn. v. Lucksinger, 231 Mo. App. 486, 101 S. W. (2d) 511, and cases cited.] The terms "valuable consideration" and "consideration" referred to in the above sections, must be interpreted to mean a lawful consideration. If the maker of any such instrument denies the existence of a lawful consideration therefor, the provisions of the foregoing sections of our statute and the judicial interpretations thereof, together with the recitals in the instruments themselves that they were made for value received, emphasize the necessity of the maker to establish his claim by a clear preponderance of credible evidence, and his proof must be cogent and convincing.

After plaintiff obtained the notes and after the time defendants claim they informed plaintiff of the infirmities in the notes which they now claim, they continued to pay on the notes and paid the note for $1000 in full, and paid all of the note for $3000, except the sum of $850, without ever mentioning the matter of usury to plaintiff or without any protest whatever. If the note in suit was in fact usurious, defendants knew it all the time and their conduct in making the payments aforesaid is quite inconsistent with their present attitude and claim in this case, and has a definite bearing upon the reasonableness and credibility of their testimony. Just when or why defendants determined they were not liable for the balance due on the notes does not appear, but they did cease and refuse to pay the balance, and plaintiff placed the note in the hands of his attorney for collection.

There are various inconsistencies in the testimony of the two defendants, particularly in reference to their claim that plaintiff had been notified that the note for $1000 had been given as interest for the loan of $3000. It is unnecessary to pass upon the question of notice to plaintiff of the alleged claim of usury before he obtained the note in question because of our conclusion, as above indicated, that there was no sufficient proof to establish usury according to the standard of proof required by law.

The case is now here after rehearing, and the parties have filed additional briefs. That in behalf of respondents emphasizes the assertion that a finding of fact by the trial court, sitting without a jury, is equivalent to the verdict by a jury and cannot be disturbed on appeal, and that the judgment of a jury-waived case can be set aside only when it is not supported by any substantial evidence in the case.

The authorities cited by respondents declare the law to be such as contended for by respondents at the time the cases referred to were decided, but they were all decided long prior to the adoption of the

new Civil Code shown in the Laws of Missouri 1943, page 356. Sec. 114 of said Code pertains to the procedure in cases tried upon facts without a jury, and paragraph (d) of said section, in its entirety, reads as follows:

"No finding of fact, except such as shall have been specifically requested, and no conclusions of law or objections to the judgment or to the opinion of the court are necessary for purposes of review. The question of the sufficiency of the evidence to. support the judgment may be raised whether or not the question was raised in the trial court. The appellate court shall review the case upon both the law and the evidence as in suits of an equitable nature. The judgment shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses. The appellate court shall consider any evidence which was rejected by the trial court and duly preserved for the appeal when the appellate court belives such evidence to be admissible. The appellate court may also order any rejected evidence to be taken by deposition or under a reference and returned to said court."

In view of the foregoing provision there is no possible doubt of the legislative intent to change the previously existing rule of procedure on appeal in a jury-waived law case, and to adopt a new and different procedure in accordance with such provision. Nor can there be any possible doubt that upon appeal in such a case, it is to be reviewed upon both the law and all the evidence. Since adoption of the new Code our Supreme Court and our appellate courts have many times in effect so ruled. [Davidson v. Eubanks, 189 S. W. (2d) 295, 296; Anson v. Tietze, 190 S. W. (2d) 193, 198; A. A. Electric Machinery Co. v. Block, 193 S. W. (2d) 631; Sutton v. Gilbert, 193 S. W. (2d) 928, 929; Gray v. Kansas City, Mo., 194 S. W. (2d) 207, 208; Kuhn v. Zepp et al., 196 S. W. (2d) 249; Deffry v. American Life & Accident Ins. Co., 193 S. W. (2d) 509, 510; A. J. Meyer & Co. v. Schulte, 189 S. W. (2d) 183, 188.]

Respondents further urge that the trial court's finding upon issues of fact must be presumed to be correct and should not be set aside unless clearly erroneous. Further reliance is placed upon said Sec. 114 (d) as above quoted, wherein it is said: "The judgment shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses."

It is our view that the statute places a duty upon the appellate court to consider and weigh the evidence and to reach its own conclusions upon issues of fact, notwithstanding the fact that such conclusions may conflict with the findings of the trial court. The trial court in this case, in order to reach the judgment rendered, necessarily found that the defendants had sustained the burden of proof as the law requires in establishing usury. We have found that such a finding

1026

was clearly erroneous and it necessarily follows that in the absence of a finding of fact which is necessary to support a judgment, the judgment is clearly erroneous.

Respondents further insist that this court should accord more deference to the findings of the trial judge than it has heretofore in regard to the opportunity of the trial judge to determine the credibility of the witnesses, although the case was submitted and tried entirely upon depositions. Respondents suggest that inasmuch as the record in the case shows that the respective parties appeared in person and by their attorneys of record when the case was called for trial, "it is possible that the judge looked at the parties and many have judged their personalities while they were sitting in the courtroom for the few minutes it took to submit the case to the trial judge," and that he may have formed some conclusions of the character of the men as they stood in open court.

We see no particular merit in such contentions according to the circumstances under which this case was presented to the trial court, and we are further of opinion that the conduct and demeanor of the defendants, as shown by the record in this case, afford a much better index of character and credibility than a mere possible casual view of them by the trial court.

In view of all of the foregoing, we have concluded that the learned trial judge was in error in entering judgment for the defendants in this case, and that said judgment is clearly erroneous, because of insufficient credible evidence to establish clearly the facts necessary to support it. It therefore results that the judgment should be reversed and the cause remanded with direction to the trial court to enter judgment for the plaintiff for the balance due on the note in suit The Commissioner so recommends.

*Sperry, C.,* concurs.

PER CURIAM.—The foregoing opinion of Boyer, C., is adopted as the opinion of the court. The judgment is reversed and the cause remanded with direction to the trial court to enter judgment for the plaintiff for the balance due on the note in suit. *Sperry, C.* All concur.