Arthur MELTON, (Plaintiff) Respondent,

v.

**ACF INDUSTRIES, INCORPORATED,**
(Defendant) Appellant.

No. 31849.

St. Louis Court of Appeals.

Missouri.

June 14, 1966.

J. C. Jaeckel, Moser, Marsalek, Carpenter, Cleary & Jaeckel, St. Louis, for appellant.

Edmund W. Albright, St. Louis, William L. Mason, Jr., Galena, for respondent.

RUDDY, Judge.

Plaintiff alleged that while he was an invitee of defendant he slipped and fell by reason of "rotten, slick and broken" wooden boards in a "platform" set approximately one-half inch below the surface of a concrete sidewalk and was injured. A jury trial resulted in a verdict for plaintiff for the sum of $8500. A remittitur of $3500 was ordered by the trial court. Plaintiff complied with said order and defendant appealed from the ensuing judgment of $5000.

The principal contention urged by defendant is that plaintiff failed to make a submissible case. In determining this contention, when reviewing the evidence, we must state the facts most favorable to plaintiff and give plaintiff all favorable inferences which might reasonably be drawn from such facts.

Plaintiff, 63 years of age, was employed by defendant on June 6, 1925. His employment was terminated on August 14, 1959, when the plant ceased operation. Pursuant to the terms of a contract between defendant and a labor union, plaintiff would receive weekly from the defendant a "sub-check" in the amount of $4.00. This check appeared to be a supplement to unemployment compensation benefits received by the employee from the State of Missouri. In order to receive these sub-checks, plaintiff had to go to the Russell Avenue plant. He did so until a sign was placed on that plant by the defendant instructing those entitled to sub-checks to get them at the defendant's plant and office at 2800 DeKalb Street. A concrete sidewalk extends north and south on the west side of defendant's DeKalb Street office. A large weighing scale is located a few feet west of the east curb line of the street and some of the equipment for the operation of this scale extends below the surface of the concrete walk and into the building of defendant. This scale equipment is protected by a wooden cover composed of 20 boards, 9 inches wide and 4 or 5 feet in length and forms a part of the sidewalk. The boards are 2½ to 3 inches thick and extend north and south. There is a small space between each board. This wooden cover extends from the east curb of the street eastwardly to a point a short distance from the wall of the defendant's building. These wooden boards join with the concrete walk and, as plaintiff and his witness testified, this wooden cover was approximately one-half inch below the surface of the concrete walk.

On January 29, 1960, about 10 A.M., pursuant to the instruction placed on the Russell Avenue plant, plaintiff went to the De-Kalb Street plant and office to get his weekly sub-check. He had visited the DeKalb Street plant on only one other occasion before this date. This previous visit took place in the summer time when the walk and wooden cover were dry. According to plaintiff, it had snowed the night of January 28, 1960, but at the time he visited the DeKalb Street office and plant, the snow had melted and the ground and wooden cover were damp and wet. In order to reach defendant's office, it was necessary for plaintiff to walk southwardly on the concrete sidewalk. While doing so he was accompanied by Robert Grandberry who was beside him and to his right. As plaintiff was walking down the sidewalk he had to cross the wooden cover. When crossing the wooden cover he slipped "on a wood—rotten board." His foot then "hit the concrete that was sticking horizontal above the board." He knew the board was rotten "because it looked like old cracked boards came up on my shoe heel." He said when his heel hit the board "it was rotten and crumpled." After he slipped his heel hit the concrete and knocked his leg back under him and he "could see a lot of fine stuff on the heel chipped off that board." Several times in the course of plaintiff's testimony he said that the concrete sidewalk next to the wooden board covering was sticking up above the wood board covering one-half an inch. There was no snow or ice on the board covering. The boards were just wet. He fell to the ground and had to be helped by Robert Grandberry. He did not know that the boards were lower than the concrete walk. He was looking down while he was walking but did not see the board before he stepped on it. He admitted it was daylight at the time and that there was nothing to prevent him from seeing the board. He could not tell that the board had any rot in it by looking at the top of it. After he slipped he could see the board was rotten. The board "looked all right" to him before he slipped. He was looking where he was going but he could not see or tell that the board was rotten.

Clarence Morgan, called as a witness by plaintiff, was a former employee of the defendant and got his sub-check on Monday or Tuesday, whereas, plaintiff got his on Friday of each week. He originally received his sub-check at the Russell Avenue plant, but pursuant to the notice placed on the plant premises, he reported to the plant

and office at 2800 DeKalb Street. On the Monday following January 29, 1960, the date of plaintiff's fall, having learned of plaintiff's accident, he looked at the board covering and when asked "what did you see," he said, "I saw they was rotten." He described the boards as weather beaten and warped and said the concrete sidewalk was about one-half inch higher than the board covering. He said that he had seen the condition of the boards and the concrete walk two or three times over a period of about three or four months. On these occasions he had noticed that the plank boards were weather beaten and dark and that the plank boards were not level with the sidewalk, adding that the boards looked like they were water soaked and had been there a "pretty good time." He did say that the half-inch difference between the boards and the concrete walk was obvious and was plain to be seen.

Plaintiff's Exhibits 1, 2 and 3 were offered in evidence by plaintiff and admitted by the court. They were photographs of the board covering and some of the surrounding area. These photographs were taken on July 28, 1960, at 4 P.M., which was six months after plaintiff's fall. The appearance of long shadows in the picture shows they were taken on a bright and sunny day. Portions of the hospital records read to the jury by plaintiff showed an entry "patient slipped on ice." This entry was signed by defendant's plant doctor who temporarily cared for plaintiff when he entered the hospital.

Defendant's evidence showed, inter alia, that the boards were made of white oak lumber. Robert Grandberry called as a witness by defendant, who was with plaintiff when he fell, said there was ice and snow on the boards but not on all the boards, stating some appeared to be wet at the time plaintiff fell. Although he had walked over these boards at least 13 times before the day plaintiff fell, he was not able to tell whether the boards were lower than the concrete sidewalk because the ends of the boards were covered with "a black top

covering." Other witnesses called by the defendant testified that there was snow and ice on the boards and the sidewalk, but said that some of the boards were not covered with snow and ice. Two of these witnesses testified that they did not believe there was any rot in any of the boards and another testified that he had crossed the wood covering frequently and did not see any rot in any of the boards in that covering. Defendant's plant manager said that the agents and employees of the Safety Department of the defendant company report any defects in the plant or on the sidewalk or wood covering. He said if any repairs are needed, defendant takes care of them. This witness further testified that defendant put in new boards when needed "because any lumber that has to be in the weather eventually has to be replaced." Defendant's employee who was assistant to the supervisor of safety and claims testified that the scale was repaired during October and November of the previous year but that the boards in the covering were not replaced. He said he had been at the plant for four years and the boards were there before he arrived. One of defendant's witnesses testified that he did not believe any of the boards were below the surface of the concrete and said that the ends of the boards were covered with black top on the date of the accident. When shown one of the photographs he did not see any evidence of rot in any of the boards. The plant manager, when shown the photographs, could not tell if the concrete was above the plank, stating, "this is the concrete here and whether it is above the plank or not, you can't tell, because from the angle the photograph was taken that could simply be a shadow there."

Defendant, in support of its contention that plaintiff failed to make a submissible case, asserts that the portion of plaintiff's testimony wherein he said that the board on which he slipped was rotten and that he "could see a lot of fine stuff on the heel chipped off that board" is without probative value and must be rejected. It says

that plaintiff's testimony of the alleged "rotten" condition of the board was rendered devoid of probative value by the three photographs, produced in evidence by plaintiff, contending that an examination of the photographs discloses the soundness of all of the boards of the covering. We have examined these photographs and we cannot place the same interpretation on them as does defendant. The pictures were taken approximately ten to twelve feet from the walkway of the boards and some of the boards show cracks and warping and darkened areas. These dark areas in the photographs are difficut to interpret. They could have been caused by moisture, oil stains or rot. Care and caution should be exercised when dealing with photographs, especially when using them to prove minute details, such as the soundness of lumber. Defendant's plant manager, when shown the photographs, could not tell if the concrete walk was above the board covering.

Defendant cites and relies on the case of Lohmann v. Wabash R. Co., 364 Mo. 910, 269 S.W.2d 885. The crucial question in that case was whether or not the driver's view of an approaching train was obscured by a contractor's field shack on defendant's railroad right-of-way. The physical facts as demonstrated by actual measurements, tests and photographs showed that the view of an approaching train was not so obscured and the court relying on these measurements, tests and photographs said: "And if the testimony of a witness upon a material issue is inherently impossible, or is so opposed to all reasonable probability as to be manifestly false, the courts are not bound to accept this and will wholly disregard it." (269 S.W.2d 1. c. 891.) The photographs in that case demonstrated clearly and unequivocally that the testimony of plaintiff's witnesses was not to be accepted. The photographs in the Lohmann case were used to identify the proximity of the contractor's shack, a fair sized building, to the railroad tracks. The detail sought to be proved there was far greater than that sought to be proved by defendant in this

case. We cannot say that the photographs in the instant case conclusively show and reveal an absence of rot in the boards.

■ Clarence Morgan also testified "they was rotten" when asked about the condition of the boards he examined on the Monday, following plaintiff's fall. Defendant also says it is common knowledge that white oak is non-porous and, therefore, will not absorb moisture. We will admit that white oak lumber when exposed to dampness is quite durable. However, opposed to this assertion of defendant, is the testimony of its plant manager, who said, when referring to the board covering, "any lumber that has to be in the weather eventually has to be replaced." The jury could have found from the evidence that this board covering had been there in excess of four years and was subjected to all kinds of weather and to the wear and tear of constant pedestrian use. The jury could have found that such exposure and use caused the "rot" found by plaintiff and Clarence Morgan.

■ Defendant next asserts that plaintiff was contributorily negligent as a matter of law. In this connection defendant says that plaintiff could have seen the "weather beaten and warped" condition of the board and could have seen that the board on which he claims to have slipped was depressed one-half inch below the adjoining concrete walk. These conditions, it asserts, were obvious and readily visible and it points to the testimony wherein plaintiff said that he was looking "where I was going" and "looking down," but that he did not see the board. Of course, as defendant points out, it is hornbook law, to look is to see what is plainly visible. What defendant has failed to recognize in this connection is that plaintiff's testimony shows that he slipped and fell because of the rotten condition of the board. He said that he could not tell that the board was rotten by looking at the top of it and that the board "looked all right" to him before he slipped. The substance of his testimony was that he was

caused to fall by reason of the rotten condition of the board which could not be seen before he fell. If the rotten condition of the board was neither open nor obvious, such failure of the plaintiff to see the rotten condition of the board could not have been the proximate cause of his injury. Contributory negligence, to be a defense, must be negligence contributing to plaintiff's injury. Triplett v. Beeler, Mo., 268 S.W.2d 814. Undoubtedly, plaintiff could see that the board was wet and slippery, but this was not what caused his fall. Nor was the raised concrete the initial cause of plaintiff's fall. It was merely a subsequent and contributing cause. He could not see the rotten condition of the board and had no reason to anticipate it or look for it. Plaintiff was not required to look out for danger where there was no reason to apprehend any. Murphy v. S. S. Kresge Company, Mo.App., 239 S.W.2d 573. We find that plaintiff was not guilty of contributory negligence as a matter of law and made a submissible case for the jury provided he was an invitee at the time of his fall.

Defendant contends that plaintiff's presence upon its premises was not for the mutual benefit of plaintiff and defendant. Therefore, it contends, plaintiff's status did not exceed that of a licensee. Frankly, the photographs indicate that the wooden covering on which plaintiff fell is not on defendant's premises, but is part of a public sidewalk appropriated by defendant to its use. Wherever the location of the wooden covering may be, the fact is, the pleadings and instructions are based on the theory that plaintiff at the time of his fall was an invitee on the premises of defendant.

■ It is true, as defendant contends, that one cannot be declared the invitee of the person sought to be held liable, for failure to exercise due care to prevent his injury, unless he was there for some purpose of real benefit or interest to such person. Richey v. Kemper, Mo., 392 S.W.2d 266, 268; Gruhalla v. George Moeller Construction Company, Mo.App., 391 S.W.2d

585. It is undisputed that there was a contract in effect between the defendant and a union of which plaintiff was a member at the time plaintiff fell on the premises. Defendant's own evidence shows that it was required to pay to the plaintiff a sum of money, namely, $4.00 per week, pursuant to the terms of the contract. Section 431.020 RSMo. 1959, 22 V.A.M.S., provides that all instruments of writing made and signed by any person whereby he shall promise to pay to any other a sum of money shall import a consideration. In the case of Gershon v. Ashkanazie, 239 Mo.App. 1012, 199 S.W.2d 38, 1. c. 46, it was held that the provisions of this statute apply to all contracts in writing, whether negotiable or non-negotiable, and that under this section the law imports consideration in the absence of affirmative proof to the contrary. Consideration means something which is of value in the eye of the law. It is something moving from one party to another, either of benefit to one or of detriment to the other. Black's Law Dictionary. As said in the case of Charles F. Curry & Company v. Hedrick, Mo., 378 S.W.2d 522, 1. c. 533: "There are various definitions of 'consideration' as applied to simple contracts. A valuable consideration 'may consist of some right, interest, profit or benefit accruing to one party, or some forbearance, loss or responsibility given, suffered or undertaken by the other.'" Defendant presented no evidence to the effect that it derived no benefit from the contract under which the sub-checks were paid to the plaintiff and in the absence of such proof by the defendant the law imports consideration and, therefore, a benefit flowing to defendant. We find that plaintiff was an invitee within the meaning of the law at the time of his fall and injury.

■ Defendant contends it is entitled to a new trial because of reversible error in the giving of plaintiff's Instruction No. 1 (citing eight specifications of error) and the trial court's refusal to give its instructions D, E, G and H. We find the trial court

erred in its refusal to give defendant's Instruction E. That instruction reads as follows:

"The Court instructs the jury that if you find and believe from the evidence that the board of the wooden cover stepped on by plaintiff was not rotted then the Court instructs you that, regardless of any other issue in the case, your verdict must be in favor of defendant and against plaintiff."

An element essential to plaintiff's recovery and contained in his Instruction No. 1 required the jury to find that there were wooden boards that were "rotten" and that "by reason of said * * * rotten * * * condition * * * said sidewalk was rendered unsafe and dangerous" and that "the plaintiff, while walking southwardly on the sidewalk, as a direct result of the negligence of the defendant ACF Industries, Incorporated, * * * plaintiff's left foot slipped upon said slick and rotten plank, if so, the surface crumbling under his said foot, if so, and directly causing said foot to strike a raised portion of said surrounding concrete about one-half inch in height above the said depressed boards, if so, and plaintiff fell to said sidewalk there as a direct result of his said left foot slipping upon said rotten board, if so, and * * * plaintiff was injured, * * *." The jury was then further instructed that if they so found their verdict must be in favor of plaintiff and against defendant.

A necessary and essential finding by the jury under that instruction was that the board was rotten. There is little doubt that this was submitted in plaintiff's Instruction No. 1 as being the "cause" of his fall. We think defendant's Instruction E exactly converses an essential element of plaintiff's instruction. Plaintiff engages in a game of semantics in order to justify the court's refusal in giving defendant's Instruction E. Plaintiff points out that his submission was of a "rotten" board, whereas, defendant's converse instruction submitted a "rotted"

board. This is a distinction without a difference. We think defendant's Instruction E is in substantially the same language as plaintiff's Instruction No. 1.

Plaintiff next contends that said Instruction E was not supported by any evidence. The answer to this is found in Kimbrough v. Chervitz, 353 Mo. 1154, 186 S.W.2d 461, 1. c. 464, in the following language:

"If a true converse instruction, it did not need testimony to sustain it; because, absent a judicial admission by a litigant having the negative that the testimony in favor of the litigant having the affirmative and the burden was true, the credibility of the witnesses giving oral testimony establishing the affirmative remains for the jury."

However, plaintiff's statement that there is no evidence to support the instruction is without merit. At least three witnesses called by the defendant testified that they did not see any rot in any of the boards in the wooden covering. Defendant's Instruction E, which was refused by the court, submitted the converse of an essential element to recover by plaintiff which was not covered by other instructions on behalf of defendant. Defendant was entitled to have this instruction given by the court. In the case of Frazier v. Ford Motor Company, 365 Mo. 62, 276 S.W.2d 95, 1. c. 101, the court said:

"In Boles v. Dunham, Mo.App., 208 S.W. 480 [3], the court held it was error to refuse a defendant's instruction presenting the converse of plaintiff's case, stating: 'Defendant was undoubtedly entitled to it.' See Davis v. Springfield Hospital, Mo.App., 196 S.W. 104, 108 [4]."

We need not discuss the other complaints that defendant has made in connection with the giving of plaintiff's Instruction No. 1 and the refusal of its other instructions,

because on a retrial of this case MAI will be used.

The judgment is reversed and the cause is remanded for a new trial.

WOLFE, P. J., and J. MORGAN DONELSON, Special Judge, concur.