Eugene C. JETER et ux., Plaintiffs-
Appellants,

v.

TITLE INSURANCE COMPANY OF MIN-
NESOTA, Defendant and Third-
Party Plaintiffs (App.),

v.

William H. DUNCAN et ux., Third-Party
Defendants (Resp.).

No. 24718.

Kansas City Court of Appeals.

Missouri.

Dec. 4, 1967.

Rehearing Denied Feb. 5, 1968.

Martin B. Dickinson, Kansas City, for appellants.

Henry H. Fox, Jr., Kansas City, for respondents.

SPERRY, Commissioner.

This suit originated by the filing of a petition against Title Insurance Company of Minnesota, defendant, wherein Mr. and Mrs. Jeter, plaintiffs, sought certain relief under a policy of title insurance issued by defendant. Title Insurance Company filed a third party petition against third party defendants, William H. and Patricia Duncan, who had sold the Jeters the property involved. This latter petition was based on the claimed liability of the Duncans to the Title Company on an indemnity agreement executed by the Duncans. The Title Insurance Company sought judgment against the Duncans in the amount of $4,-110.53, that being the amount it had expended in successfully defending the title in a suit against Lake Lotawana Development Company and the Jeters. The Duncans denied liability on the theory that execution of the indemnity agreement by them was not supported by consideration and was procured by fraud. There was a separate trial on the third party plaintiff's petition. From an adverse judgment in that case the Title Company appeals. Mr. and Mrs. Jeter are not parties to or interested in this appeal.

The Duncans were the owners of lots 25, 26, 27, Block Z in Lake Lotawana. There existed valuable improvements thereon, consisting of a dwelling house and other structures. These structures extended beyond the boundaries of the lots and into a parkway lying between said boundaries and the water line of Lake Lotawana. This parkway area had been reserved by Lake Lotawana Development Company, a corporation, for the common use and benefit of the corporation and of all lot owners in the area. No part thereof had been conveyed by it to the original grantee of the lots mentioned above. These structures had existed since they were built, in the 1930's.

There was introduced into evidence, as exhibits, a number of documents, and sev-

eral witnesses gave oral testimony. The court made and announced detailed findings of fact and conclusions of law. We will endeavor to condense and state the ultimate facts as disclosed by the record.

In the autumn of 1954 the Duncans contracted to sell this property to Mr. and Mrs. Jeter, for a consideration of $25,000.00. Mr. Jeter and Dr. Duncan met on the property and discussed the fact that the structures on the lots intruded on the parkway, as shown by a document produced by Dr. Duncan and shown to Mr. Jeter, it being a "survey" of the property. Dr. Duncan told Mr. Jeter that he had discussed this matter with his attorney, Mr. Fox, who had advised him that he believed Dr. Duncan had good title by reason of adverse possession. Thereafter, Mr. Jeter and Mr. Fox conferred with four officers of McDaniel Title Company, (which was agent for Minnesota Title Company) including attorneys Howard and Thomas, regarding the issuance by it of a title insurance policy on this property. The conferees agreed to the effect that a quiet title suit could quickly be brought and successfully maintained, and that all title defects could be corrected. Thereafter, at the solicitation of McDaniel, Mr. Jeter requested issuance of the policy which is involved in this case.

In October, 1958, Jeter notified McDaniel that certain lot owners in the Lake Lotawana subdivision of Jackson County, had trespassed on his property. Later, several lot owners sued the Jeters and Lotawana. Mr. Jeter demanded that the Title Company defend the action. McDaniel notified the Duncans and demanded that they protect or reimburse the Title Company (under an indemnity agreement executed by them), for all sums for which it might become liable by reason of this claim and action.

Mr. Jeter stated in evidence that at no time when he discussed the title matter with the Title Company was there any mention made of a requirement that the Duncans execute an indemnity contract; that McDaniel was fully aware of the problem presented regarding the title; that he, Jeter, understood that the Title Company would charge Dr. Duncan an extra fee ($250.00) to cover the possible expenses of a quiet title suit; that he did not hear of any indemnity contract whereby the Duncans would agree to indemnify the Title Company to the extent of the face amount of the policy, $25,000.00, if the Title Company should be required to pay out money because of claims made against it; that witness and Mr. Fox discussed the matter with officers of McDaniel on at least two occasions but that he, Jeter, did not learn about the idemnity contract until after suit was instituted by Erb and others, area lot owners, against him and the Lotawana Development Company.

Dr. Duncan testified to the effect that he contracted to sell this property to Mr. and Mrs. Jeter; that Mr. Fox represented him in connection with clearing up questions concerning title to the property in this transaction, but that Mr. Fox was not present at any time in connection with the execution of the indemnification contract; that, on December 24th, 1954, he, Duncan, paid McDaniel $404.00, and he identified Exhibit 1, which is a receipt signed by McDaniel, wherein the following charges appear: $125.00; "Extra Risk" $250.00; other charges $29.00. Dr. Duncan further stated that he had, prior thereto, received a letter from McDaniel stating that "everything was in order and for me to come in and sign some papers".

Exhibit 2 was introduced in evidence. It was a letter dated October 21st, 1954, from McDaniel, signed by Mr. Howard, McDaniel's attorney, addressed to Mr. Fox, attorney for the Duncans. The existence of the Duncan structures on the "parkway" in violation of restrictions in the deed, is mentioned and Mr. Howard gave it as his unqualified opinion that the Duncan title to the encroached area could be established by a quiet title suit.

Dr. Duncan stated that Mr. Fox advised him, by telephone, to go ahead and sign the Title Company papers, but that Fox had not discussed the indemnity agreement

with him. The indemnity agreement was signed by the Duncans on December 7th, 1954. Dr. Duncan stated that, at that time, he was in the McDaniel office from thirty to forty-five minutes; that he saw and talked with one man but doesn't remember his identity; that he was told that McDaniel had issued "one title that I had signed which was 'ordinarily good enough to protect me under any circumstances but they would recommend, I mean as a title company, to get added insurance on account of there being difficulty around the lake at times for a full title * * * that they would recommend I take out a second policy * * * to doubly assure me that I would be protected'"; that he agreed to take it; that it was his opinion, after the conversation with McDaniel, that he was cleared; that he was handed another paper to sign "which was the assurance that I would be protected"; that only Dr. and Mrs. Duncan, and a representative of McDaniel, were then present; that he had never before seen the paper he signed; that he did not know that it was typed on plain (not McDaniel) stationery; that no mention was made of Duncan's possible liability on this instrument (which was, in fact, the indemnity agreement); that he did not read it but relied solely on what he was told; that he did not know why it was necessary that he sign the papers but "they assured me it was double insurance and double protection for me"; that he had had no previous experience in selling real estate.

On cross examination Dr. Duncan stated that, after the contract was made in September, 1954, he learned that the buildings on the property extended into the parkway; that the water line of the lake rose after they were constructed; that, when he was notified of a threatened suit involving the title, he referred the entire matter to Mr. Fox; that he paid for the title insurance "because they agreed to protect me in case anything happened, I mean, verbally in their office, that's why I * * * *"; that Mr. Fox knew about the original title policy (which cost $125.00); 'the second one he didn't know anything about'; '* * * well, I thought I was paying $250.00 primarily to protect myself'", because the Title Company insured an unusual risk.

Mr. Thomas, attorney for McDaniel, stated that Mr. Jeter applied for title insurance. He identified a letter (Exhibit 7), bearing his signature addressed to Mr. Jeter in which conditions for issuance of insurance were discussed. He stated that he prepared Exhibit 3, the indemnity agreement; that he prepared and mailed to Mr. Fox, Exhibit 6, inclosing documents required to be executed by the Duncans for issuance of the policy but, he stated, he could not say that a copy of the indemnity agreement was included; that, so far as he knew, it was not included; that there is no record that it (indemnity agreement) was sent to Mr. Fox; that he never discussed this matter with the Duncans or with Mr. Fox, their attorney; that the file was given to Mr. Howard who, presumably, was present when Exhibit 3 was signed by the Duncans; that it was not customary for McDaniel to deal directly with an applicant for insurance except in the presence and with the knowledge of his attorney; that the indemnity agreement was drawn subsequent to a conversation on the subject between witness and Mr. Jeter, of which the Duncans had no knowledge. Exhibit 6, which was in evidence, was a memorandum letter written to Mr. Fox by Mr. Thomas December 2nd, five days prior to the date appearing on the indemnification agreement. Certain documents were mentioned in the latter, and Mr. Fox's attention was directed to them. It contained no reference to the indemnification agreement and McDaniel had nothing in its files indicating that any such notice thereof was given to Mr. Fox, although it was the custom to furnish attorneys for clients seeking title insurance with copies of such agreements before execution; that such attorneys "should pass on it".

The interlocutory judgment was "that the indemnity writing under date of December 7th, 1954, described in the defendant-third

party plaintiff's petition be \* \* \* cancelled, set aside, annulled, and declared to be of no force and effect". The judgment was, later, made final.

Mr. Howard testified. He identified Exhibit 2 as being a letter to Mr. Fox, signed by witness, stating that title to the lots herein could be perfected by suit. He did not remember having closed the title insurance matter; did not recall having seen the indemnification agreement; did not remember the Duncans; and did not remember having ever talked to Mr. Fox about the matter.

From the evidence the court could have found, and did find, that the Title Company had, throughout the negotiations, predicated its charge for issuance of the policy upon the assumption that the sum of $250.00, charged as an extra risk fee, was sufficient to reimburse it for the cost of a quiet title action, should one become necessary in order to clear the title; that, on December 7th, 1954, the Duncans, in the offices of the Title Company, signed various documents, including Exhibit 3, the indemnification agreement; that neither the Duncans nor Mr. Fox had previously considered or examined the instrument; that the Duncans paid a total of $404.00 to McDaniel; that said sum constituted the entire agreed consideration for issuance of the policy; that Exhibit 3 is "nudum pactum constituting mere voluntary promises devoid of and lacking any consideration"; that Dr. and Mrs. Duncan are entitled, in equity and good conscience, to be relieved of the indemnity writing; and that "the participation by the Duncans in the defense of Erb v. Lake Lotawana Development Company, et al, was a gratuitous and voluntary gesture and cannot constitute estoppel (which defense was neither pleaded nor proved)".

The Title Company well knew, at all times, that the title was defective but believed that it could be made good by a quiet title suit. Mr. Jeter attended one, or probably two conferences between McDaniel, who was there represented by four senior officers, and Mr. Fox, attorney for the Duncans. He stated that these matters were discussed and that he understood that the Title Company would issue a policy in consideration of receipt by it of $250.00 (in addition to the regular fee of $125.00) as an extra hazard fee, which, Jeter said, he believed was McDaniel's estimated cost of a quiet title suit, *should one be necessary.* *Mr. Jeter stated that he did not learn about the indemnity contract until after the filing of this suit.* Written documents from the McDaniel files indicate that McDaniel believed that a title suit would not actually be required. However, on December 7th, McDaniel requested the Duncans to come in and close the matter. McDaniel did not furnish either the Duncans or their attorney with a copy of Exhibit 3, nor did it ever mention the indemnity agreement to Mr. Fox, their attorney. That is the evidence. Dr. Duncan stated that he signed without understanding the true nature of the agreement but he believed he was paying for the extra risk.

Title Company cites and relies on Section 431.020 V.A.M.S. In Gershon v. Ashkanazie, 239 Mo.App. 1012, 199 S.W.2d, 38, 48, this court held that all written and signed instruments providing for the payment of money by one party to another import consideration in the absence of proof to the contrary. However, in this case, the court found from substantial evidence that the Duncans did not knowingly agree to pay any money other than the $250.00 extra risk fee, and that they paid the full price demanded for the "extra risk". The court's ruling that the indemnity contract is "nudum pactum" is correct and rests on the established facts in this case.

We cannot say that the judgment is clearly erroneous and it is affirmed.

MAUGHMER, C., concurs.

PER CURIAM:

The foregoing opinion of SPERRY, C., is adopted as the opinion of the Court.

HOWARD, P. J., and CROSS, J., concur.

MORGAN, J., not participating because not a member of the Court when the cause was submitted.